Leonard J. SPECHT, Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

No. 15903.

United States Court of Appeals
Eighth Circuit.

April 29, 1958.

Roy K. Dietrich and William J. Burrell, Kansas City, Mo. (James T. Seigfreid and Dietrich, Tyler, Davis, Burrell & Dicus, Kansas City, Mo., were with them on the brief), for petitioner.

O. D. Ozment, Asst. Gen. Counsel, Litigation and Research, Civil Aeronautics Board, Washington, D. C. (Victor R. Hansen, Asst. Atty. Gen., Daniel M. Friedman, Atty., Dept. of Justice, Franklin M. Stone, Gen. Counsel, Civil Aeronautics Board, John H. Wanner, Associate Gen. Counsel, and William J. Dixon and Ulrich v. Hoffmann, Attys., Civil Aeronautics Board, Washington, D. C., were with him on the brief), for respondent.

George F. Archer, Chicago, Ill., for Air Line Pilots Association, International, Amicus Curiae.

Before GARDNER, Chief Judge, and VOGEL and VAN OOSTERHOUT, Circuit Judges.

VOGEL, Circuit Judge.

█ Petitioner herein, Leonard J. Specht, seeks review of an order of the Civil Aeronautics Board which revoked his airline transport pilot rating. The effect of the Board's order was to require petitioner to cease flying as pilot in command. He is permitted to act as co-pilot and was issued such license. In the proceedings before the Civil Aeronautics Board, the Board found that the petitioner violated certain Civil Air Regulations. The original complaint charges that on January 29, 1957, Captain Specht, who was pilot in command of TWA Flight 19 Constellation operating between New York, N. Y., and St. Louis, Mo., while proceeding under instrument flight rules, failed to adhere to his air traffic control clearance to maintain 14,000 feet and climbed to 18,000 feet; that Captain Specht had been instructed by the air traffic control to maintain 14,000 feet on account of traffic at 16,000 feet; that the 16,000-foot level was occupied by Capital Airlines Flight 31 proceeding in the same direction; that Captain Specht climbed through the 16,000-foot level without clearance and despite advice that 16,000 feet was occupied. The complaint alleges that by his actions Captain Specht violated the following Civil Air Regulations: (a) § 60.19,[1] in that he operated an aircraft contrary to air traffic control instructions in areas where air traffic control was being exercised; (b) § 60.21,[2] in that he deviated from the provisions of an air traffic control clearance; (c) § 60.-

1. "§ 60.19 *Air traffic control instructions.* No person shall operate an aircraft contrary to air traffic control instructions in areas where air traffic control is exercised."

2. "§ 60.21 *Adherence to air traffic clearances.* When an air traffic clearance has been obtained under either the VFR or IFR rules, the pilot in command of the aircraft shall not deviate from the provisions thereof unless an amended clearance is obtained. In case emergency authority is used to deviate from the provision of an air traffic clearance, the pilot in command shall notify air traffic control as soon as possible and, if necessary, obtain an amended clearance. However, nothing in this section shall prevent a pilot, operating on an IFR traffic clearance, from notifying air traffic control that he is canceling his IFR flight plan and proceeding under VFR: *Provided,* That he is operating in VFR weather conditions when he takes such action."

12,[3] in that he operated an aircraft in a careless manner so as to endanger the lives and property of others. The complaint charges that Captain Specht " * * * by his actions as heretofore alleged, demonstrated a lack of the degree of responsibility, care and judgment required of the holder of an Airline Transport Pilot Certificate".

Captain Specht's answer was to the effect that the actions complained of " * * * were necessary and proper, and were taken only after the declaration of an emergency in accordance with his right and duty under Civil Air Regulations Part 40, Section 40.360 entitled 'Emergency Declarations; Pilot-in-Command and Air Traffic Dispatcher', which said declaration of emergency by Respondent was acknowledged by Air Traffic Control."[4, 5] For an affirmative defense, Captain Specht alleged that he encountered an icing condition which in his best judgment imperiled his aircraft and the

passengers and crew thereof and that in accordance with his right and duty he declared an emergency, left his assigned altitude of 14,000 feet and climbed to 18,-000 feet.

In a hearing before an Examiner, petitioner was found to have violated the three Civil Air Regulations referred to and his airline transport rating was ordered suspended for a period of six months.[6] The Administrator, seeking revocation rather than suspension, filed notice of appeal from the ruling of the Examiner because of the Examiner's failure to find lack of qualification to hold an airline transport pilot rating. Petitioner likewise appealed and the matter came on for hearing before the Civil Aeronautics Board. The Board reviewed the entire case, adopted the findings and conclusions of the Examiner except as modified and concluded:

"Upon consideration of the entire record and in view of all the forego-

3. "§ 60.12 *Careless or reckless operation.* No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others."

4. "§ 40.360 *Emergency decisions; pilot in command and aircraft dispatcher.* (a) In emergency situations which require immediate decision and action, the pilot in command may follow any course of action which he considers necessary under the circumstances. In such instances the pilot in command, to the extent required in the interest of safety, may deviate from prescribed operations procedures and methods, weather minimums, and the regulations of this subchapter.

(b) If an emergency situation arises during the course of a flight which requires immediate decision and action on the part of the aircraft dispatcher, and which is known to him, he shall advise the pilot in command of such situation. The aircraft dispatcher shall ascertain the decision of the pilot in command and shall cause the same to be made a matter of record. If unable to communicate with the pilot, the dispatcher shall declare an emergency and follow any course of action which he considers necessary under the circumstances.

(c) When emergency authority is exercised by the pilot in command or by the dispatcher, the appropriate dispatch

center shall be kept fully informed regarding the progress of the flight, and within 10 days after the completion of the particular flight a written report of any deviation shall be submitted by the individual declaring the emergency to the Administrator through the air carrier operations manager."

5. "§ 60.2 *Authority of the pilot.* The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. In emergency situations which require immediate decision and action the pilot may deviate from the rules prescribed in this part to the extent required by consideration of safety. When such emergency authority is exercised, the pilot, upon request of the Administrator, shall file a written report of such deviation. In an emergency situation which results in no deviation from the rules prescribed in this part but which requires air traffic control to give priority to an aircraft, the pilot of such aircraft shall make a report within 48 hours of such emergency situation to the nearest regional office of the Administrator."

6. Because petitioner's rating had previously been summarily suspended for two months by the Administrator, this suspension was to continue only for a four-months' period.

ing we find respondent violated Sections 60.19, 60.21, and 60.12 of the Civil Air Regulations in the respects hereinabove set forth, that respondent lacks the qualifications required of the holder of an airline transport pilot certificate in the respects indicated above, and that such lack of qualifications constitutes cause which would presently justify the Administrator in refusing to issue to respondent a like certificate, and that the order of revocation set forth below is required in the interest of the public in the proper discharge of the Board's statutory duty to assure the highest degree of safety in air transportation."

Whereupon, petitioner's pilot rating was revoked. The findings of the Board were unanimous. Three of the members, constituting a majority, held that the Examiner's order of suspension should be cancelled and Captain Specht's airline transport rating revoked and so ordered; whereas, two concurring and dissenting members of the Board believed that suspension of Captain Specht's airline transport pilot rating for a reasonable time would constitute an appropriate remedial and corrective action.

The record indicates that on the flight in question the TWA Constellation captained by the petitioner took off from LaGuardia Airport, New York, at 9:55 a.m. on January 29, 1957, for St. Louis, Missouri, under instrument flight rules. Four minutes later, also under instrument flight rules, a Capital Viscount, a faster plane, left LaGuardia for Chicago. The two craft were to fly the same airway as far as Erie, Pennsylvania. Both had requested a flying altitude of 16,000 feet but were initially directed to fly at lower altitudes. TWA at 14,000 and Capital at 12,000 feet. Shortly after leaving LaGuardia Capital was authorized to fly at 16,000 feet and went to that altitude. Shortly thereafter, at 10:25 a.m. petitioner called TWA radio and asked the company to find out "why Capital F31 out after us and off after us was assigned our preferred altitude". At 10.27¼ a.m. petitioner asked the control tower for an altitude of 18,000 feet. He was advised that there was traffic above him and was asked if he could fly under visual flight rules, to which he gave a negative response. A transcript of the recorded conversations thereafter among the petitioner, as captain of TWA-19, the control tower and the captain of Capital-31, and which is not questioned, follows:

"1027½  NY ARTCC: Roger 19, unable to approve 18,000 over.
1027½  TWA-19  : We're going to leave 14,000 in about 3 minutes you get him out of the way.
1027¾  NY ARTCC: TWA-19 will you say again.
1027¾  TWA-19  : I said we're going to vacate 14,000 to go up in about 3 minutes. You get him out of the way.
1028  NY ARTCC: TWA-19 I am unable to approve a higher altitude account traffic at 16,000, over.
1028  TWA-19  : Move 16,000 out of the way then. In the first place we were off LaGuardia first and we taxied out first ahead of that traffic and that was our requested altitude and we should have had it.

1030  TWA-19  : New York Center, TWA-19.
1030  NY ARTCC: TWA-19 go ahead.
1030  TWA-19  : Is 18,000 available.
1030  NY ARTCC: TWA-19 standby.
1030¼  NY ARTCC: TWA-19 negative.
1030¼  TWA-19  : Why not?
1030¼  NY ARTCC: TWA-19 I have traffic.
1030½  TWA-19  : I want to know what it is.

| | | | |
|---|---|---|---|
| | 1030½ | NY ARTCC: | TWA–19 change over to company dispatcher and put your request through him, over. |
| | 1030¾ | TWA–19 : | I'm not going to change over, I'm going to leave 14,000. |
| | 1030¾ | NY ARTCC: | Roger. |
| | 1030¾ | TWA–19 : | When I ask you a simple question I want an answer. Is 18,000 available? |
| EJO | 1031 | NY ARTCC: | Negative. |
| | | TWA–19 : | New York Center, TWA–19. |
| | 1031 | NY ARTCC: | TWA–19 this is New York Center you have traffic at 16,000, maintain 14. JB |
| | 1031 | TWA–19 : | You get that traffic out of 16, I'm going up there. |
| | 1031¼ | NY ARTCC: | Traffic is maintaining 16,000, traffic is maintaining 16,000, do you (sic) a special reason for vacating 14? |
| | 1031¼ | TWA–19 : | I'm going to declare an emergency you better get him out of there. |
| | 1031¼ | NY ARTCC: | Say again. |
| | 1031¼ | TWA–19 : | I asked for 18 just a while ago and didn't get any answer. |
| | 1031½ | NY ARTCC: | I don't receive you, why are you vacating 14,000, are you declaring an emergency, over. |
| | 1031¾ | NY ARTCC: | —19 are you declaring an emergency, over. |
| | 1031¾ | TWA–19 : | I asked you if 18,000 is available, I want to know. |
| | 1032 | NY ARTCC: | You can climb VFR to 18,000 its available over. |
| | 1032 | TWA–19 : | Is 18,000 occupied? |
| | 1032 | NY ARTCC: | Negative. |
| | 1032 | TWA–19 : | O.K., is Capital 31 maintaining 16,000? |
| | 1032 | NY ARTCC: | Say again. |
| | 1032 | TWA–19 : | Is Capital 31 maintaining 16? |
| | 1032¼ | NY ARTCC: | TWA–19, maintain 14,000 unless you are declaring an emergency, over. |
| | 1032½ | TWA–19 : | O.K., I'm declaring an emergency and I'm leaving 14,000. |
| | 1032½ | NY ARTCC: | You have traffic above you at 16,000. JB |
| | 1032½ | TWA–19 : | I can't help it. |
| | 1033 | CAP–31 : | New York Center, Capital 31. |
| EJO | 1033 | NY ARTCC: | Capital 31, New York. |
| | 1033 | CAP–31 : | O.K., did TWA leave 14? |
| | 1033 | NY ARTCC: | Capital 31, standby. |
| | 1033 | NY ARTCC: | TWA–19 have you left, 14,000, over. |
| | 1033¼ | TWA–19 : | I'm vacating 16,000 right now. |
| | 1033¼ | NY ARTCC: | Who is vacating 16, over? |
| | 1033¼ | NY ARTCC: | Which aircraft is vacating 16, over? |
| | 1033½ | TWA–19 : | TWA–19 is. |
| | 1033½ | CAP–31 : | New York Center, this is Capital 31, we're reversing course at 16,000. |
| | 1033¾ | NY ARTCC: | Capital 31 understand TWA–19 has left your altitude, over. |
| | 1033¾ | CAP–31 : | I just saw TWA come right up through my altitude off to the left, and I want to know why he did it. |
| | 1034 | NY ARTCC: | Capital 31, TWA–19 went right up through your altitude with no clearance, over. |

EJO 1034 CAP–31 : O.K. (rest unreadable).

1034¼ NY ARTCC: Roger, roger.

1034¼ TWA–19 : TWA did it, because airways refused to vacate you out of it and advise you.

1034½ CAP–31 : (unreadable) do you want to run over somebody. You didn't miss me by very much.

1034½ TWA–19 : What was my heading?

1034¾ CAP–31 : What?

1034¾ TWA–19 : What was my heading when you saw me?

1034¾ CAP–31 : My heading was 300 degrees and yours on about 280—275.

TWA–19 : That's right.

1034¾ CAP–31 : What was the emergency you declared because they couldn't get traffic out of the way.

1034¾ TWA–19 : I gave him 8 minutes and he refused flatly to do it.

1035 CAP–31 : That's ok, you never gave him 8 minutes to move me out of the way.

1035 TWA–19 : He wouldn't contact you.

1035 CAP–31 : New York Center, this is Capital 31.

NY ARTCC: Capital 31, go ahead.

1035¼ CAP–31 : OK, because of that TWA trip we moved off to the right, we're now over Wilkes Barre 35 16,000.

1035¾ NY ARTCC: Capital 31, roger report this frequency passing Stoney Fork over.

1035¾ CAP–31 : Roger.

1036¾ CAP–31 : New York Center, this is Capital 31.

1037 NY ARTCC: Capital 31, go ahead.

1037 CAP–31 : OK you got a transcript of all this that transpired?

1037 NY ARTCC: That is affirmative Capital 31, its all recorded.

1037 CAP–31 : OK, I'm going to check on it when I get back to New York.

1037.1 NY ARTCC: Roger Capital 31. Roger.

1037.5 CAP–31 : You might put down there that 31 saw that TWA airplane and he wasn't more than a mile away from us when we saw him, and we were not VFR at the time and they didn't give us any warning that he was, or enough warning to get us out of the way before he left that altitude.

1037.5 NY ARTCC: Capital 31, roger.

1038 TWA–19 : New York Center TWA–19.

1038 NY ARTCC: TWA–19 go ahead.

1038¼ TWA–19 : TWA–19 over Wilkes-Barre 36, 18,000, Stoney Fork 08, Bradford.

EJO 1038.5 NY ARTCC: TWA–19 roger, report passing Stoney Fork this frequency.

1038.5 TWA–19 : Roger.

1041 NY ARTCC: TWA–19, New York, over.

1041½ NY ARTCC: TWA–19, New York, over.

1041½ NY ARTCC: Trans-World 19 this is New York Center do you read? Over.

1041½ NY ARTCC: TWA–19, New York Center.

1044¾ NY ARTCC: TWA–19 are you still in emergency conditions?

1045 TWA–19 : Negative.

EJO 1045  NY ARTCC: Watch Supervisor is requesting information as to state of emergency that you declared.

1045 TWA–19 : He has it.

1045 NY ARTCC: TWA–19 roger.

1047 TWA–19 : New York Center, TWA–19.

1047 NY ARTCC: TWA–19, New York Center, over.

1047 TWA–19 : What was that request you made.

1047¼ NY ARTCC: I requested information whether you are continuing on emergency conditions. I did not have the time that you discontinued the emergency, over.

1047¼ TWA–19 : You wanted something else about a report.

1047½ NY ARTCC: Say again sir.

1047½ TWA–19 : Something about a report.

1047½ NY ARTCC: I have made no statement as to any report, sir.

1047¾ TWA–19 : Who wanted it.

1047¾ TWA–19 : The Watch Supervisor—Watch Supervisor.

1047¾ NY ARTCC: (Unreadable).

1048 NY ARTCC: TWA–19, New York Central.

1048 TWA–19 : Go ahead now.

1048 NY ARTCC: TWA–19 now go to Company—Company request.

1048 TWA–19 : Are we cleared to maintain 18,000.

1048 NY ARTCC: TWA–19 you are cleared to maintain 18,000 feet until further advised that it is affirmative."

———◆———

It should be noted here that Captain Specht declared an emergency at 10:32½ and that no reason for the emergency was given to the control tower, although the tower asked for the reason he was vacating 14,000 and for information as to the state of the emergency. From the transcript, Captain Specht in fact assumed to take over the duty of directing the conduct of planes within the jurisdiction of the control tower operator, and not only gave directions but made angry demands. Captain Murphy, Capital's pilot, asked Captain Specht why TWA came right up through his altitude. Specht replied, "TWA did it, because airways refused to vacate you out of it and advise you." In response to Captain Murphy's further question as to what the emergency was, Captain Specht replied, "I gave him 8 minutes and he refused flatly to do it." In response to the watch supervisor's request for information as to the state of the emergency, Captain Specht replied, "He has it." It should be noted also that there is no mention in the record of icing until 10:48, at which time Captain

Specht, in response to his company's request regarding the reasons for the emergency, transmitted via company radio the following message:

"Account ice. Requested from ATC change in altitude, 18,000, being unavailable traffic at 16,000, unable to climb VFR after repeated requests with no change granted, airways flatly refused to move Capital out of 16,000. 19 declared emergency vacated 14,000 at 1033 went through 16,000, 1034 on a heading perpendicular to and to left side of course. Reported all procedures to ATC."

Captain Specht's flight log does show an entry, "Requested altitude change 1025E account icing at 140". It is significant, however, that that entry is by interlineation only, from which the finders of the fact could conclude that the notation about the "icing" was an afterthought and inserted subsequent to the entry regarding the declaration of an emergency. Captain Specht, in his testimo-

ny, stated that he was quite sure that somewhere at the very start of the conversation between the tower and himself he talked about ice.

In testifying at the hearing, he stated he "considered it a severe icing condition," and:

"At 10:32½ our icing condition had become such that I felt that I must do something and do it fast."

"At the time I declared the emergency, it appeared to me, through the previous radio contacts, that there was going to be no relief and that it was entirely up to me to take care of the situation. I begged and pleaded to get out of there, that is, asking for altitude, trying to get out of 14,000 feet. I made no headway whatsoever. I stated that I was going to declare an emergency. There was nothing done about that. The final answer, when it came, was just, maintain 14,000 feet. There was nothing left for me to do, either sit there at 14,000 feet and let the airplane become uncontrollable or get it out of there. There was no other recourse. There was nothing to be gained by waiting."

The quoted portions of Captain Specht's testimony at the hearing find no corroboration in his declarations made at the time of the transaction here involved. That record not only fails to corroborate, but in fact destroys, his oral testimony with reference to his declaration of an emergency.

In a report, Exhibit J, made the day following the incident herein, Captain Specht reported:

"* * * I began to pick up ice quite rapidly at 14,000'; * * *. At 10:25 I requested a higher altitude and advised that I would have to vacate 14,000' within 3 minutes. * * * I advised that 14,000' was untenable account ice accumulation and that I wanted to know why Capital No. 31 off after me assigned 16,000' could not be moved so I could vacate 14,000' and again advised

ATC that I could not stay at 140 and intended leaving it." (Emphasis supplied.)

We have examined the entire record but find no good purpose would be served in a detailed statement of all of the evidence here. As to whether or not there was a severe icing condition at 14,000 feet there is conflict. In general, the testimony of the co-pilot corroborates the testimony of Captain Specht. From other testimony, a contrary conclusion could be drawn. Additionally, the rate at which the aircraft climbed from 14,000 feet to 18,000 feet would indicate that it was not burdened with ice.

Petitioner's first contention is that there is no substantial evidence that he violated 14 C.F.R. § 60.19 and 14 C.F.R. § 60.21, supra. There is no question but what Captain Specht operated his aircraft "* * * contrary to air traffic control instructions in areas where air traffic control is exercised," 14 C.F.R. § 60.19, and that he did deviate from the provisions of an air traffic clearance without obtaining an amended clearance, a violation of 14 C.F.R. § 60.21. Petitioner admits that he did vacate 14,000 feet and that he went to 18,000 feet but contends that this deviation resulted from a declared emergency and was for the safety of his passengers and his aircraft, as authorized and provided by 14 C.F.R. § 40.360 and 14 C.F.R. § 60.2, supra. If an emergency actually existed which justified Captain Specht's departure from his assigned altitude and he followed proper procedures in doing so, then there was no violation of the two sections referred to. The Board, however, had the right under the circumstances present here to consider all of the evidence and to determine whether an emergency had been established. The Examiner, in findings adopted by the Board, stated:

"* * * the preponderance of the evidence sustains a finding that the Respondent was not in an emergency situation, nor in a situation which reasonably would lead him to believe that, unless he took immediate action, the safety of his aircraft

would be endangered. The evidence sustains a finding also that the Respondent exercised his emergency authority irresponsibly and declared an emergency in order to obtain a preferred altitude. Under the circumstances, the defense of the Respondent based upon the provisions of Sections 60.2 and 40.360 of the regulations must fail and the deviations from the regulations found to be in violation of Sections 60.19 and 60.21 of the regulations."

The Board concurred and found that the emergency did not exist and that Captain Specht "was truculent and in an angry mood" over not receiving an altitude to which he regarded himself as entitled and that he improperly declared the emergency. If Captain Specht and the co-pilot who supported him are to be believed as against the findings of the Board, the declared emergency was justified and accordingly §§ 60.19 and 60.21 were not in fact violated.

49 U.S.C.A. § 646(e) provides:

"The findings of facts by the Board, if supported by substantial evidence, shall be conclusive."

██ ██ If there is substantial evidence in the record to support the Board's findings, this court must affirm, regardless of what its views might have been had it had the power of fact determination. As this court said in Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 1940, 113 F.2d 698, 701, affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251:

"It must be remembered that, within the limits of the jurisdiction conferred upon it, the power of a court or an administrative board to decide questions is not confined to deciding them correctly. Thompson v. Terminal Shares, 8 Cir., 89 F.2d 652, 655. A jury may decide incorrectly issues of fact, but if its verdict is within the evidence its mistakes of fact cannot be corrected on review. Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 444. And the determination by a legislative body of a de-batable question which it has power to decide is not subject to judicial reexamination. United States v. Carolene Products Co., 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234."

The weight and credibility of the testimony is for the Board's determination. In National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, the Supreme Court said:

"As we stated in National Labor Relations Board v. Waterman Steamship Corp., supra, 309 U.S. [206] at pages 208, 209, 60 S.Ct. [493] at pages 495, 496, 84 L.Ed. 704: '* * * Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act.' Congress entrusted the Board, not the Courts, with the power to draw inferences from the facts. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831; National Labor Relations Board v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 311, 84 L.Ed. 396. The Board, like other expert agencies dealing with specialized fields (see Rochester Telephone Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 764, 83 L.Ed. 1147; Swayne & Hoyt v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 481, 81 L.Ed. 659) has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony."

The rule thus stated is applicable to the findings of the Civil Aeronautics Board. See Cameron v. Civil Aeronautics Board,

7 Cir., 1944, 140 F.2d 482, 483, certiorari denied 323 U.S. 716, 65 S.Ct. 43, 89 L.Ed. 576; Kuhn v. Civil Aeronautics Board, 1950, 87 U.S.App.D.C. 130, 183 F.2d 839; North American Airlines, Inc., v. Civil Aeronautics Board, 1956, 100 U.S.App. D.C. 5, 240 F.2d 867, 871, certiorari denied 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed. 2d 760.

We think here that the failure to mention an icing condition or to give any reason whatsoever for the declared emergency, the making of bare demands without stating justification for a change to an 18,000-foot altitude, the failure to respond to questions as to why the 18,000-foot altitude was desired, the wording of Captain Specht's demands, the "account icing" notation interlined in the pilot's log, the disputed testimony with reference to icing conditions and the conflicting reasons for the rate of climb from 14,000 to 18,000 feet form substantial evidence to justify the conclusion of the Board that no emergency existed.

■ Petitioner's second contention is that there is no substantial evidence to support the conclusion of the Board that petitioner acted carelessly and recklessly, in violation of 14 C.F.R. § 60.12. In finding that,

"* * * in performing his emergency maneuvers, respondent not only failed to exercise the highest degree of care as expected of an airline transport pilot but did not use even ordinary care and was thereby 'careless' within the meaning of Section 60.12 of the Civil Air Regulations; * * *"

the Board stated in its opinion:

"Thus, in obvious anger over not receiving an altitude to which he regarded himself as entitled, respondent deliberately and unjustifiably climbed his aircraft through space known by him to be occupied by another airliner, and, as the Examiner found, without exercising even ordinary care in the conduct of such a dangerous maneuver."

The Examiner stated:

"Regardless of the motives which prompted him to leave his assigned altitude, he not only did not exercise 'the highest degree of care', but evinced a lack of even ordinary care in executing his emergency maneuvers. He left his altitude without informing either air traffic control or Captain Murphy (pilot in charge of Capital-31) of his intentions. He left his altitude without taking precautionary measures which were known and available to him. He left his altitude without finding out the weather and visibility conditions at the altitude to which he was going. He left his altitude without adequate exploration of the feasibility of alternative courses of action. He left his altitude and climbed through the altitude of another passenger-carrying aircraft and consciously accepted a 'calculated risk' based upon a number of assumptions which were in themselves unreasonable and when in the exercise of ordinary care and judgment, he could have obviated or minimized the risk involved."

The Examiner further found:

"Even though Captain Specht's emergency declaration had been found reasonable and the violations of the regulations thereby excused, the record would still support the finding that in exercising his emergency procedures he had failed to exercise the degree of responsibility, care and judgment required of an airline transport pilot."

We think it clear from what has already been pointed out that substantial testimony in the record supports the finding of the Examiner and the Board that petitioner violated 14 C.F.R. § 60.12.

Petitioner's third contention is that the Board erroneously placed the burden of proof on him to show that there was in fact an emergency situation on the occasion in question and that the burden of proof should have been upon the Admin-

istrator to establish the contrary. The complaint herein charged the petitioner with a violation of three of the Civil Air Regulations, supra.

■ In his answer, petitioner did not deny the occurrence of the acts complained of. He sought to avoid their consequences by affirmatively pleading that those acts, which would ordinarily constitute violations of safety regulations, were justified under a declared state of emergency existing at that time. Such form of pleading was not only proper but necessary under the Rules of Practice in Air Safety Proceedings. 14 C.F.R., Part 301, §§ 301.7, 301.37, Fed.Rules Civ.Proc. rule 8(c), 28 U.S.C.A. Cohen v. United States, 8 Cir., 1942, 129 F.2d 733; Schmidtke v. Conesa, 1 Cir., 1944, 141 F. 2d 634; Syracuse Broadcasting Corp. v. Newhouse, D.C.N.Y.1953, 14 F.R.D. 168, 170. Having pleaded an exception as an affirmative defense to the alleged violations, petitioner assumed the burden of proving the existence of an emergency within the meaning of the exception. Walling v. General Industries Co., 1947, 330 U.S. 545, 547–548, 67 S.Ct. 883, 91 L.Ed. 1088; United States v. Poland, 1920, 251 U.S. 221, 227–228, 40 S.Ct. 127, 64 L.Ed. 236; Mid-Continent Petroleum Corporation v. Keen, 8 Cir., 1946, 157 F. 2d 310, 315. See Tendler v. Jaffe, 1953, 92 U.S.App.D.C. 2, 203 F.2d 14, 17, certiorari denied 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344.

In addition thereto, the facts and circumstances of the claimed emergency were peculiarly within the knowledge of the pilot. It was not error to rest the burden of going forward with the proof of the emergency on the pilot who claimed it.

■ Petitioner's Points 4 and 5 are interdependent and will be treated together. These points are based upon the following argument: That petitioner has satisfied all the technical requirements for an airline transport pilot rating (14 C.F.R. §§ 21.10–21.18); that there is no substantial evidence upon which a contrary finding in this regard could be made;

and that petitioner is, therefore, qualified to hold that rating and certificate. Petitioner points out, then, that any revocation of an airline transport pilot certificate by the Board under 49 U.S.C.A. § 559 must be based upon a finding that the pilot in question could properly be refused issuance of such certificate, i. e., that such pilot was not qualified, from which he then argues that the revocation of the certificate here of a qualified pilot is penal in nature and not within the Board's remedial powers under 49 U.S. C.A. § 559.

Admittedly, petitioner possesses the technical skills required of the holder of an airline transport pilot rating, the Board having stated in its opinion:

"We do not doubt respondent's technical ability to pilot an airplane, and believe that we can, consistently with our over-all duties and responsibilities, permit respondent to hold a commercial pilot certificate."

But the Board had found that:

"The chain of events leading up to respondent's action was such as to have insured the bringing into play of whatever degree of responsibility, care, and judgment respondent could muster. His preference for a higher assigned altitude than 14,000 feet existed prior to take-off. He encountered repeated denials of his repeated requests for a higher altitude, and the aggravation which this continuing frustration generated in him became evident long before his action. During the same time, he was continuously aware of the general proximity of the unseen Viscount flying the same course above him, and the specific notion of climbing through its altitude had entered his mind at least a full five minutes before he did so. Thus all the elements which would have evoked the qualities required to exercise command responsibility were full-blown well before respondent acted. He was not caught unaware by a sudden unanticipated situation, and these qualities had every opportunity and rea-

son to assert themselves. The only conclusion is that such responsibility, care and judgment as respondent possessed proved insufficient under the pressure of his anger, and that his failure to exercise them in the required degree was due to deficiencies in these respects. The record is devoid of any other explanation of what occurred.

"Thus, in obvious anger over not receiving an altitude to which he regarded himself as entitled, respondent deliberately and unjustifiably climbed his aircraft through space known by him to be occupied by another airliner, and, as the Examiner found, without exercising even ordinary care in the conduct of such a dangerous maneuver. Respondent needlessly jeopardized the lives of approximately 40 persons aboard his plane, as well as of the occupants of the other aircraft. That this conduct demonstrates a lack of judgment and care is plain, and it was irresponsible to the extreme. The pilot who can control his plane but cannot control himself is not a safe pilot. The Civil Aeronautics Act specifically enjoins the Board, in the furtherance of its air safety responsibilities, to act in such manner as to 'assure the highest degree of safety in air transportation.' (Section 2 (b) of the Act. See also Sections 2 (e) and 601(b) of the Act [49 U.S. C.A. §§ 402(b, e), 551(b)].) The Board, in conformance with the Congressional mandate, has demanded that pilots who sit at the controls of passenger-carrying airliners exercise 'the highest degree of care,' (Stead Airman Certificate, 1 C.A.A. 74; 84-5 (1939).) and we have consistently taken the view that this standard assumes a high degree of responsibility, care and judgment by the pilot. (Stead et al., 1 C.A.A. 74 (1939); Rentzel v. Sisto, 13 C.A.B. 125 (1948); Horne v. Bessey, 13 C.A.B. 550 (1952).) Respondent's conduct

demonstrates that he does not measure up to this standard, and does not possess the attributes required of a pilot-in-command. (Since the record contains no substantial evidence from which requalification can be inferred, the deficiency as of the time of the episode imports the finding of present deficiency.)"

We agree with the Board that technical proficiency is not the only requirement upon which the issuance or retention of an airline transport pilot rating is conditioned. A successful applicant for or holder of such certificate should possess a demonstrated degree of judgment, unaffected by his temperament or disposition, which will enable him to consistently perform his technical skills in a manner conducive to the safety of his passengers, aircraft and crew. Implicit in the issuance of an airline transport pilot rating and certificate is the Administrator's finding that the holder thereof possesses the degree of judgment required of a pilot in command. Normally, an applicant's record in training and aeronautical experience in addition to his manner of executing the qualifying exercises required by 14 C.F.R. §§ 21.10–21.18 will provide a sound basis for a finding of sufficient judgment. However, the failure to exercise due care and the unjustified violations of safety regulations, whether in anger or truculence or not, by an otherwise qualified applicant should certainly form a substantial evidentiary basis for a finding that the applicant was not qualified to hold such certificate. Such a finding as to an applicant would, of course, have justified the Administrator of Civil Aeronautics in refusing to issue a certificate.

We hold the Board acted well within its statutory authority in revoking petitioner's license upon its finding based on substantial evidence " * * * that respondent lacks the qualifications required of the holder of an airline transport pilot certificate in the respects indicated above, and that such lack of qualifications constitutes cause which would presently jus-

tify the Administrator in refusing to issue to respondent a like certificate, and that the order of revocation set forth below is required in the interest of the public in the proper discharge of the Board's statutory duty to assure the highest degree of safety in air transportation." Cf. Sisto v. Civil Aeronautics Board, 1949, 86 U.S.App.D.C. 31, 179 F.2d 47; Walker v. Civil Aeronautics Board, 2 Cir., 1958, 251 F.2d 954.

Since the Board had statutory authority to revoke petitioner's certificate under 49 U.S.C.A. § 559, the primary effect of that revocation is remedial, in that a pilot not qualified to command an airline transport aircraft has been denied the authority to do so.

Lastly, it is asserted that the Administrator, having asked for suspension or revocation in his original complaint, is not a proper party to appeal the order of the C.A.B.'s Examiner, which granted the relief prayed for by suspending petitioner's airline transport pilot certificate for a period of six months. In support of his contention, petitioner cites Lee v. Civil Aeronautics Board, 1955, 96 U.S. App.D.C. 299, 225 F.2d 950. That case construes 49 U.S.C.A. § 646(a), which authorizes a review of any order of the Board by the Courts of Appeals of the United States, " * * * upon petition, * * * by any person disclosing a substantial interest in such order." The Lee case merely holds that the Administrator is not "any person disclosing a substantial interest" in the Board's order and accordingly lacks standing to petition for review by a Court of Appeals. That is not our situation here. The Rules of Practice in Air Safety Proceedings, 14 C.F.R. § 301.0, et seq., provide that the Administrator may initiate a proceeding for suspension or revocation. The Administrator is a "party" to such proceedings. A hearing on the proceedings is to be held before an Examiner assigned by the Board. The Examiner has the power to make initial decisions which become final if there is no appeal to the Board from "either party". We think it perfectly

clear from the regulations that the Administrator, being a "party" to the proceedings before the Examiner, had the right to appeal to the Board. Additionally, the petitioner's own appeal from the Examiner's order placed the entire matter before the Board for determination.

Affirmed.