Sheldon E. PANGBURN, Petitioner,

v.

CIVIL AERONAUTICS BOARD et al., Respondents.

No. 5990.

United States Court of Appeals First Circuit.

Dec. 14, 1962.

Lane McGovern, Boston, Mass., with whom John P. O'Brien, Arlington Heights, Ill., and Ropes & Gray, Boston, Mass., were on brief, for petitioner.

Robert L. Toomey, Attorney, Civil Aeronautics Bd., and James D. Hill, Deputy Gen. Counsel, Federal Aviation Agency, with whom Lee Loevinger, Asst. Atty. Gen., Lionel Kestenbaum and Arthur J. Murphy, Jr., Attys., Dept. of Justice, John H. Wanner, Gen. Counsel, Joseph B. Goldman, Deputy Gen. Counsel, O. D. Ozment, Assoc. Gen. Counsel, Litigation and Legislation, Civil Aeronautics Bd.,

Nathaniel H. Goodrich, Gen. Counsel, and John E. Marsh, Atty., Federal Aviation Agency, were on brief, for respondents.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition for review of an order of the Civil Aeronautics Boards issued pursuant to Section 609 of the Federal Aviation Act (49 U.S.C. § 1429), which affirmed an order of the Administrator of the Federal Aviation Agency suspending petitioner's Airline Transport Pilot Rating for a period of ninety days.

The incident giving rise to the suspension order was the crash at New York's La Guardia Airport on September 14, 1960, of an American Airlines Electra piloted by petitioner.

The petitioner was at the time of the accident and has since continued to be a senior airline pilot and the superintendent of flying for American Airlines at Boston.

Shortly after the crash the Board commenced an accident investigation pursuant to Section 701(a) of the Act (49 U.S.C. § 1441(a)). Under this section the Board has the duty of investigating accidents involving civil aircraft and making public reports setting forth "the facts, conditions, and circumstances relating to each accident and the probable cause thereof." Incident to this investigation, hearings were held by the Board on October 19, 20 and November 21, 1960.

Contemporaneously with these separate investigatory activities of the Board, the Administrator commenced proceedings against the petitioner under Section 609 of the Act.[1] Six days after the accident petitioner was served with a

---

1. So far as is relevant here, Section 609 provides: "The Administrator may, from time to time, * * * reexamine any civil airman. If, as a result of any such reinspection or reexamination, or if, as a result of any other investigation made by the Administrator, he determines that safety in air commerce or air transportation and the public interest requires, the Administrator may issue an order amending, modifying, suspending, or revoking, in whole or in part, any type * * * airman certificate, * * *."

Notice of Proposed Certificate Action, in which he was advised that the Administrator proposed to suspend his Airline Transport Pilot Rating for ninety days. On September 26, 1960 petitioner and his representative participated in an "informal" hearing in New York and gave their version of the crash. Thereafter, on September 28, 1960, the Administrator, finding that petitioner had "failed to exercise the degree of care, skill, judgment, and responsibility required of an airline transport pilot while operating an aircraft in scheduled air transportation" ordered the ninety days suspension.

In accordance with the provisions of Section 609, petitioner appealed to the Board from the Order of the Administrator and this appeal stayed the effectiveness of the suspension order. (49 U.S.C. § 1429).

A hearing before the Board's trial examiner was held on December 6–9, 1960. Subsequently, the hearing was briefly reopened on May 4, 1961. The examiner's Initial Decision was issued on August 30, 1961. In it he found that petitioner had been guilty of misjudgment in connection with the crash and affirmed the Administrator's order.

On March 9, 1961 after the December hearing—but before the examiner had rendered his decision—the petitioner, through counsel, wrote to the Board requesting that it defer issuance of its Accident Investigation Report (which was being independently conducted pursuant to Section 701(a)) until after the trial examiner and the Board itself had acted under Section 609. In the petitioner's words this action was prompted by a desire to avoid "the potentialities for prejudgment caused by the Board's having already made a publicly pronounced answer to the very same specific question (whether [petitioner] committed pilot error) that is the crux of the present proceeding." The Board denied this request. Some four months later, on August 28, 1961, the Board's Accident Report was released. This report, which determined that pilot error was the probable cause of the crash, antedated the trial examiner's decision by two days.

Thereafter, petitioner filed a notice of appeal to the full Board. In addition, on October 2, 1961 he filed a motion to reverse the order of the Administrator and to dismiss the complaint on the basis of "prejudgment." The Board rendered its Opinion and Order on March 15, 1962 denying the appeal and reaffirming "that safety in air transportation and the public interest require affirmance of the Administrator's order of suspension." The Board also denied petitioner's motion to dismiss the complaint, rejecting the argument that it had prejudged the case.

In this petition for review petitioner challenges the action of the Board on three grounds. First, he argues that the Board's findings of pilot negligence are unclear, inconsistent and unsupported. Next, he contends that the record will not permit a finding that his suspension is required by "safety in air commerce or air transportation"—the statutory standard for the type of action taken here. Finally, petitioner contends that the Board's order violated fundamental due process considerations because of the asserted dangers of "prejudgment" stemming from the Board's combined investigatory and adjudicatory functions.

We shall consider these contentions seriatim. As noted previously, petitioner was at the controls of the aircraft when it struck the top of a dyke and crashed while making a landing at La Guardia Airport during the course of a scheduled flight from Boston to St. Louis via New York City. After a routine flight from Boston, in excellent weather, the aircraft had been cleared to land by the La Guardia control tower and was making its final approach. What next transpired is described in the examiner's Initial Decision, and is not disputed by petitioner:

"  *  *  *  At 0900:47, the main gear of the aircraft contacted the top of a dyke bounding the southeast border of the airport on Flushing Bay. This dyke is constructed of

dirt and when originally built extended 15 feet above mean sea level. On its landward side, it is 7.98 feet above the level of Runway 31 and is 163.4 feet from the threshold of Runway 31. The aircraft struck the dyke in an approximately level wing attitude, although there is evidence to the effect that the left wing was slightly down. As indicated by the photographs in evidence, the left main gear failed to clear the top of the dyke by approximately one and one-half feet and the right main gear by approximately one foot. The left main gear separated from the aircraft on contact with the airport surface and the left wing tore off at the fuselage shortly thereafter. The aircraft slowly rolled over to an inverted position and came to rest on its back off the left side of the runway, with its direction reversed. Although the aircraft immediately burst into flames and was totally destroyed, the passengers and the crew were evacuated without serious injury."

The fundamental question here is the reason why the airplane crashed into the dyke while landing.

Petitioner raises no question of a mechanical malfunctioning of the aircraft.

In his Order of Suspension, the Administrator found that the cause of the crash resided in the fact that in executing his approach petitioner had permitted the aircraft "to descend to an altitude which was insufficient to permit it to clear the dyke" and thus caused the aircraft to collide with the dyke. In sum, the Administrator charged negligence.

Petitioner denied that the crash resulted from negligence. Rather, he contended that the aircraft collided with the dyke due to an unforeseeable downdraft or thermal "sink" which caused the left wing to drop and the aircraft to settle. He contended that this drop occurred such a short time before reaching the dyke that he was unable to take corrective action.

In his Initial Decision, the trial examiner concluded, after an exhaustive review of the evidence, that "[N]o settling of a magnitude not correctable by a pilot of [petitioner's] skill occurred. * * * " This finding was sustained on the appeal to the Board which found that "no significant settling of the aircraft occurred." We perceive no need of an additional elucidation of the evidence on this point by us and we believe that the record abundantly supports the conclusion of the trial examiner and the Board.

After rejecting this asserted defense, the examiner found two acts of misjudgment on petitioner's part. Initially he determined that: "[I]n the execution of a skillful, precisely planned approach * * * requiring minimum clearance over the dyke, [petitioner] misjudged his actual clearance." Secondly, he concluded that: "[T]he failure to provide maneuvering space for slight deviations in his intended flight path, caused by not unusual air disturbances over an obstacle, which were known to him and therefore plainly foreseeable, must be considered an act of misjudgment also."

On appeal, the Board sustained the examiner in the following language:

" * * * As we view the record, with the elimination of the probability of the unavoidable and unexpected settling contended for by respondent, the evidence indicates either (1) a last-minute mistake in judgment on respondent's part as to his actual clearance, or (2) a mistake in judgment through *failure to provide in the planning of the approach* sufficient 'maneuvering space for slight deviations in his [respondent's] intended flight path * * * ' which were known to and foreseeable by respondent. The evidence establishes that either of these two acts of misjudgment occurred, and we find it unnecessary to determine which was the crucial factor * * * " (emphasis supplied)

The basis of petitioner's attack on the findings is the Board's use of the disjunc-

tive relative to the two assertedly distinct acts of misjudgment found by the trial examiner. Moreover, the petitioner argues that the Board either went beyond the findings of the trial examiner or effectively undercut them when it used the italicized language quoted above— "failure to provide in the planning of the approach."

We do not agree with petitioner. So far as the use of the disjunctive is concerned we believe that the Board merely concluded—as do we—that the record amply supported a finding of negligence whether viewed from the aspect of a misjudgment as to clearance while over the dyke, or as a misjudgment—perhaps slightly earlier in point of time—in failing to provide a prudent margin of maneuvering space to adjust to foreseeable contingencies while clearing the dyke. The Board declined to speculate as to which of these acts of misjudgment was "crucial"—and by this undoubtedly meant "determinative." However, when viewed in the context of an Electra approaching a runway at the rate of descent of the one involved here, the two acts were assuredly not conceptual dichotomies.[2] In either case, the Board could conclude—and the record would support the conclusion—that petitioner was too low and it was negligence on his part that caused the crash.

The Board's decision not to specify the precise point in the approach at which the negligence occurred—whether in failing to provide sufficient room to maneuver, or in underestimating the actual clearance while flying directly over the dyke, does not, in our judgment, detract from the Board's finding of negligence in striking the dyke.

The second prong of petitioner's attack on the findings proceeds on the basis that the Board in defining the second act of misjudgment actually broke "new ground." This relates to the Board's language that petitioner made "a mistake in judgment through failure to provide *in the planning of the approach* sufficient maneuvering space." Since the examiner had concluded that the approach down to an altitude of 100 feet was safe and normal, in petitioner's view, the Board introduced a new act of misjudgment upon which the examiner had not passed. Thus he argues:

"A failure properly to plan the approach of an airplane to a landing field is not a failure that occurs in the last few seconds of descent, within 100 feet of landing. The 'planning of the approach' precedes, not follows, the approach's actual occurrence. Thus unless the words added by the Board are skipped over or ignored, one is inevitably led to the conclusion that the Board was thinking of, and found, an act of negligence by the petitioner which did *not* occur in the last 100 feet of descent and which was, therefore, not the same thing that the examiner found. * * *"

We believe that the petitioner's contention is little more than a semantic quibble. The pilot of a jet airliner hurtling towards a landing must be constantly "planning" his approach. There are no easy philosophic compartmentilizations enabling us to determine the mental passage from "planning" to "execution." Planning is a continuing process involving continuous acts of pilot judgment whose segregation is neither possible nor desirable. We believe that the Board simply held that in the last 100 feet one of these acts of judgment went askew and the result was that the airliner collided with the dyke.

2. In his initial decision the examiner concluded that the flight was "safe" and "normal" until the point where the plane had descended to an altitude of 100 feet and the negligence occurred in the last few seconds from that point until impact. The aircraft's air speed was a constant 120 knots which under prevailing winds meant that the ground speed made good was 170 feet per second. Petitioner estimated his rate of descent at 600 to 800 feet per minute based on the power settings which he was using.

In sum, we believe that the findings of negligence are amply supported by substantial evidence and we affirm the Board's findings in this regard.[3]

We turn then to the question of whether on the facts of the present record suspension of petitioner's rating was authorized. Under the Civil Aeronautics Act of 1938, § 609 (52 Stat. 1011, 49 U.S.C. § 559), the Board was authorized to suspend an airman certificate "if the interest of the public so requires," and to revoke such certificate "for any cause which, at the time of the revocation, would justify the Administrator * * in refusing to issue to the holder of such certificate a like certificate." Under Section 609 of the Federal Aviation Act, adopted in 1958, suspension or revocation may be ordered if "safety in air commerce or air transportation and the public interest" requires.

Petitioner argues that the change in statutory language restricted the grounds for suspension to those cases where it could be demonstrated that the petitioner's lack of technical qualifications indicated that "safety" required the suspension. Petitioner contends and the record shows—the present accident apart—that he was and apparently continues to be an able and well qualified pilot. Consequently, in his view, there has been no showing that "safety in air commerce or air transportation" requires the suspension.

█ The Board takes the position that quite apart from the qualifications or competency of a pilot, it has the right under Section 609 to impose a suspension as a "sanction" against specific conduct or because of its "deterrence" value— either to the subject offender or to others similarly situated. In short, the Board contends that it may order suspension for disciplinary purposes. We agree with the Board.

Under the provisions of the 1938 Act suspensions were frequently imposed as a deterrent sanction notwithstanding the apparent technical qualifications of the pilot. The imposition of a suspension as a sanction was challenged under the 1938 Act in Wilson v. Civil Aeronautics Board, 100 U.S.App.D.C. 325, 244 F.2d 773 (1957), cert. den., 355 U.S. 870, 78 S.Ct. 119, 2 L.Ed.2d 75. In that case the petitioner argued that a suspension order could only be issued under Section 609 where there was a demonstration of a lack of technical qualification and that absent such a finding, the Board could only impose a monetary penalty under Section 901 (49 U.S.C. § 621). The Court of Appeals for the District of Columbia rejected these contentions. Relying on the consistent administrative practice of over 4,000 such suspensions during the course of administering the Act, the broad discretionary authority which the statute vested in the Board, and a clear recognition of the valuable deterrent effect of such suspensions, the court held that the administrative practice should be sustained for "the most cogent of reasons—air safety." In sum, the court held that the Board could impose suspensions, as a deterrent sanction, "in the interest of the public," because . a vital "public interest" was "air safety."

Similarly the Seventh Circuit upheld a deterrent suspension in Hard v. Civil Aeronautics Board, 248 F.2d 761 (7th Cir., 1957), cert. den., 355 U.S. 960, 78 S. Ct. 543, 2 L.Ed.2d 534 (1958). There the suspension stemmed from an accident in which the petitioner destroyed his aircraft due to poor planning and execution of an approach. There was no finding that he was deficient in technical flying qualifications. Notwithstanding this fact the court affirmed the statutory grant to the Board of broad authority to enforce the "highest degree of safety,"

---

3. While we cannot determine whether or not the Board relied on the doctrine of res ipsa loquitur in the instant case, we are unable to perceive a more classic example for its invocation. See, Citrola

v. Eastern Air Lines, Inc., 264 F.2d 815 (2nd Cir., 1959); Smith v. Pennsylvania Central Airlines Corporation, 76 F.Supp. 940, 6 A.L.R.2d 521 (D.C.D.C.1948). Note, 37 Geo.L.J. 275.

and rejected petitioner's argument restricting use of suspension orders. See also, Specht v. Civil Aeronautics Board, 254 F.2d 905, 78 A.L.R.2d 1135 (8th Cir., 1958).

Since the enactment of the 1958 Act the Board has consistently interpreted it as authorizing a continuation of the previous judicially approved standards and practice of imposing suspension as a disciplinary measure for deterrent purposes. It is well settled that the interpretation by the agency charged with the responsibility of administering the Act is entitled to great weight. Power Reactor Development Co. v. International Union of Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). See also, Wilson v. Civil Aeronautics Board, supra, where it is stated "This consistent and, until now, unchallenged administrative practice 'will not be overturned except for very cogent reasons * * *.'" 244 F.2d at 774.

A review of the legislative history of the 1958 Act shows no intention to circumscribe the conditions under which a suspension may be imposed by the Board. Indeed, there is clear indication that it was the Congressional intent to preserve the prior practice in safety proceedings. Thus, Congressman Harris, Chairman of the House Committee on Interstate and Foreign Commerce, explained the purpose of the new Section 609 to the House as follows:

> "This right of review by the Board is not intended to change existing relationships as announced by the courts, either with respect to the burden of proof in such cases, which would be borne by the agency, or with respect to conditions under which, or the purposes for which safety certificates may be suspended or revoked * * *." (104 Cong. Rec. 16081, August 4, 1958, emphasis added.)

In short, we find no indication that Congress intended to restrict the Board's interpretation of its authority to invoke suspensions in cases such as this. One of the dominant motives of Congress in passing the 1958 Act was "to insure the maximum possible safety and efficiency under proper regulations, impartially enforced." H.Rep. No. 2360, 85th Cong., 2d Sess., p. 7; U.S.Code Cong. and Admin.News 1958, p. 3747; S.Rep. No. 1811, 85th Cong., 2d Sess., H.Rep. No. 1272, 85th Cong., 2d Sess., p. 9. Surely, it cannot be gainsaid that the power to impose a suspension on an errant pilot in an appropriate case will go far "to insure the maximum possible safety." And it is just as clear that limiting the Board's power of suspension only to those cases where technical incompetence is shown would, in our opinion, be contrary to the purpose of the Act.

Petitioner's final point raises a question of procedural due process. Specifically, he contends that the Board's prior issuance of its Accident Investigation Report fixing "pilot error" as the cause of the crash, precluded him from obtaining an impartial tribunal for the hearing of his appeal from the order of the Administrator. He raises no issue of actual bias or prejudice on the part of the Board members but relies on the possibilities of prejudgment—albeit unintentional—inherent in the combination of functions.

Section 701 of the Act makes it a duty of the Board to investigate accidents involving civil aircraft and "report the facts, conditions, and circumstances * * and the probable cause thereof." Under this provision the Board is required to make recommendations to the Administrator aimed at forestalling the likelihood of "similar accidents in the future." As a result of its investigation the Board made two such recommendations to the Administrator: (1) that a "Visual Glide Slope System" which was then undergoing tests by the Federal Aviation Agency be applied to La Guardia Airport as soon as practicable and (2) that

procedures for providing illumination of passenger exit markings be reexamined.

As to the probable cause of the accident, the Board concluded:

"* * * that the probable cause of this accident was the failure of the pilot to properly plan and execute the approach to a landing. Factors which may have contributed were the shortened runway and the unmarked upper portion of the dike."

█ Section 609, on the other hand, authorized the Board to entertain and decide appeals from revocation or suspension orders of the Administrator. This provision is brought into play on petitioner's election to take such an appeal. Here unlike a Section 701 action, the purpose of the proceedings is not to determine probable cause or to consider safety recommendations but rather to decide whether air safety and the public interest require suspension of a petitioner's certificate. While, in the nature of things, similar questions may frequently be involved in the two proceedings, there is a clear-cut and fundamental difference—both in the nature of and in the Board's function under—the two sections of the statute. Moreover, in both proceedings the Board is acting under a Congressional mandate to perform the functions which were in fact performed here.

█ It is well settled that a combination of investigative and judicial functions within an agency does not violate due process. Belizaro v. Zimmerman, 200 F.2d 282 (3rd Cir., 1952); United States ex rel. Catalano v. Shaughnessy, 197 F.2d 65 (2nd Cir., 1952); Levers v. Berkshire, 159 F.2d 689 (10th Cir., 1947); Roccaforte v. Mulcahey, 169 F.Supp. 360 (D.C.Mass.1958), aff'd, per curiam, 1 Cir., 262 F.2d 957; Brinkley v. Hassig, 83 F.2d 351 (10th Cir., 1936), 2 Davis, Administrative Law Treatise, § 13.02. See, Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Indeed that provision of the Administrative Procedure Act which prohibits the same person from investigating and rendering a decision in the same matter, expressly excludes from its operation "the agency * * * or any member or members of the body comprising the agency." (5 U.S.C. § 1004).

█ The Board has demonstrated that in performing its statutory function under Section 609, it does not consider itself bound by any accident report which it previously may have issued, but rather considers it to be its duty to adjudicate the petitioner's appeal strictly on the basis of the record established in the 609 proceeding. Wade, Airman Certificate, 13 C.A.B. Reports, 227, 331. In that case the Board reached a contrary conclusion in the Section 609 proceeding from that which it had previously reached in its accident report.

In the instant case the accident report was not introduced into evidence in the Section 609 proceeding and the Board affirmatively stated in its decision that "[t]he record and findings in the * * * proceeding under section 701 * * * are not considered by the Board in reaching a decision on an appeal under Section 609. The record of the proceeding before us and the applicable law are the sole basis for decision, and the Board is not in any way bound by findings made in an earlier accident investigation proceeding."

Petitioner contends that the determinative point is not whether the Board regards itself as "bound" by its earlier report but whether through its previous contact with the facts of the case through its investigatory activities and previously published opinion it is constitutionally deficient as an "impartial tribunal." He argues that those cases which have upheld the constitutionality of adjudicative findings following earlier investigatory determinations are those where the prior findings related to general law and policy, see, Federal Trade Comm. v. Cement Institute, supra, and not to a concrete and specific factual determination. We do not believe that the cases support this view.

In National Labor Relations Board v. Donnelly Co., 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854 (1947), the prior determination related to specific facts about a specific party. In that case the Supreme Court held that a trial examiner was under no disqualification by virtue of having previously announced a position regarding an analysis of particular facts which he subsequently had to appraise in a further adjudication. There the issue initially before the trial examiner was whether the company had instituted the formation of a company union and thereafter dominated it. The company attempted to rebut the charge by proffering a large body of specific evidence. The examiner stated that he believed the type of evidence offered was without "value" and immaterial. The Board affirmed his ruling but was subsequently reversed by the Eighth Circuit because of error in excluding the evidence. Upon remand for further proceedings, the Board assigned the case to the same examiner who had presided over the initial hearing. This action was attacked by the company on the ground that "a party ought not to be put to trial before an examiner who, by reason of his prior rulings and findings, may not be capable of exercising impartiality." In an unanimous opinion, the Supreme Court rejected the argument stating:

> "Certainly it is not the rule of judicial administration that, statutory requirements apart, * * * a judge is disqualified from sitting in a retrial because he was reversed on earlier rulings. We find no warrant for imposing upon administrative agencies a stiffer rule, whereby examiners would be disentitled to sit because they ruled strongly against a party in the first hearing. * * *"
> Id., at 236, 237, 67 S.Ct. at 765.

See also, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955); MacKay v. McAlexander, 268 F.2d 35 (9th Cir., 1959) where it was held that "no unfairness or lack of due process was inherent in the fact" that the same hearing officer who presided at the deportation proceeding presided at the hearing on suspension of deportation.

As noted by the Supreme Court, National Labor Relations Board v. Donnelly, supra, there is no proscription against a judge sitting in the same case following the reversal of his former position on appeal. Moreover, it has been held that this rule applies even in criminal cases where a trial judge has expressed his belief in the defendant's guilt at the original trial. Kolowich v. Ferguson, 264 Mich. 668, 250 N.W. 875 (1933); State v. Atterberry, 134 S.C. 392, 133 S.E. 101 (1926); In re J. P. Linahan, 138 F.2d 650 (2nd Cir., 1943).

Moreover, in two recent cases the Supreme Court has upheld the right of judges who initiated contempt proceedings to try them even in that situation where the contempt is "personal to himself." Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952); Nilva v. United States, 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957). But see, In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

Experience in the states confirms the fact that prior involvement in a particular case will not, of itself, disqualify an individual from subsequently passing on adjudicatory facts. In Board of Medical Examiners v. Steward, 203 Md. 574, 102 A.2d 248 (1954), a lower court had set aside an order of a board of medical examiners revoking a license to practice on the ground that the members of the board had "already committed themselves publicly" and were therefore disqualified to hear the case a second time. Even though the Maryland Court of Appeals had no jurisdiction over the appeal, it is stated that the question was "of considerable public importance" and thus wrote an opinion that the members of the Board were not disqualified to hear the case a second time. See Mayor of City of Everett v. Superior Court, 324 Mass. 144, 85 N.E.2d 214 (1949). Com-

pare, Molloy v. Collins, 66 R.I. 251, 18 A.2d 639 (1941).

■ Upon examination of the foregoing cases, we cannot say that the mere fact that a tribunal has had contact with a particular factual complex in a prior hearing, or indeed has taken a public position on the facts, is enough to place that tribunal under a constitutional inhibition to pass upon the facts in a subsequent hearing. We believe that more is required. Particularly is this so in the instant case where the Board's prior contact with the case resulted from its following the Congressional mandate to investigate and report the probable cause of all civil air accidents. If we were to accept petitioner's argument, it would mean that because the Board obeyed the mandate of Section 701, it was thereupon constitutionally precluded from carrying out its responsibilities under Section 609.

■ Petitioner has contended that the Board should have delayed publishing its report until all proceedings under Section 609 had been completed. However, we must assume that it was not only the intent of Congress that the causes of air accidents should be unearthed but that the reasons for the accidents be made public as expeditiously as possible so that corrective action would be meaningful. Surely, it would not be in the public interest for these findings to be suppressed until such time as the entire administrative proceedings under Section 609 had run their course—however long that might be in a given case. In short, we believe that the Board's action in the instant case was entirely in accord with the statutory framework provided for by Congress and that the Act is not constitutionally defective. If there is to be a change in the statutory framework, the impetus for that change must come from Congress and not from this court. Levers v. Berkshire, 159 F.2d 689, 693 (10th Cir., 1947).

Judgment will be entered affirming the order of the Board.