**UNITED STATES of America, Appellant,**

v.

**STEPHEN BROTHERS LINE, Appellee.**

**No. 23746.**

United States Court of Appeals
Fifth Circuit.

Sept. 27, 1967.

Alfred E. Sapp, Asst. U. S. Atty., Miami, Fla., Alan S. Rosenthal, Florence Wagman Roisman, Attys., Dept. of Justice, Washington, D. C., for appellant.

No attorney entered and no brief filed for appellee.

Before BROWN, Chief Judge, BELL, Circuit Judge, and BREWSTER, District Judge.

JOHN R. BROWN, Chief Judge:

Now in its sixth decade the Shipping Act of 1916 affords the basis for the first and only suit for severe civil penalties brought by the Government for failure of a water carrier in foreign commerce to file appropriate tariffs. A second count asserted like penalties under the Intercoastal Shipping Act, a later 1933 enactment. The Government lost both counts, the foreign commerce claim at the close of the Government's evidence, the second at the conclusion of the carrier's case. The big issue [1] as to each was whether the carrier's activity was that of a common carrier by water, not a tramp or so-called contract or private carrier. We reverse as to the foreign commerce count but affirm as to domestic-interterritorial commerce.

The case got off to a bad start largely because someone, presumably in Washington, D.C. was mixed up, not on law, but on geography. Thus, the complaint, in its first count alleged that the Carrier [2] was engaged in common carriage in foreign commerce between Miami, Florida and "Central and South American ports." The proof, all received without objection and virtually without the slightest real contradiction, showed extensive operations between Miami and the Dominican Republic—an island near, but hardly in, either Central or South America. It was largely this disparity between pleading and proof on geography which scuttled that count. The second one based on shipments from Miami to the Virgin Islands, a United States territory, seems to have stranded on some credibility choices in a structure of proof that left much to be desired.

Although the Shipping Act of 1916, 46 U.S.C.A. § 801 et seq., had always required a common carrier by water in foreign commerce to "establish, observe and enforce just and reasonable rates, * * * and tariffs" and to "file with the [Shipping] Board and keep open to public inspection," 46 U.S.C.A. § 817, prescribed information about rates and tariffs it was the radical revision of the Act in 1961 which precipitates this litigation. Under the structure of the initial Act all the carrier had to file was a schedule of *maximum* rates. Similarly, the prohibition on charges collected merely forbade the carrier to "demand, charge, or collect a *greater* compensation" than the filed rates. It was, therefore, a structure of a published mandatory ceiling, not a floor, or a ceiling and floor.

All this was changed in the 1961 revision. [3] Now for the first time in the nation's history and its legislative efforts to maintain a strong merchant marine the law compelled such a carrier to maintain, file and enforce published tariffs reflecting, not the minimum, not the maximum, but the one and only rate to be charged and collected for the specified transportation service. [4]

---

1. Actually, it is undisputed that no tariff had been filed.

2. Stephens Brothers Line, a partnership.

3. The immediate stimuli was the decision of the Supreme Court in Federal Maritime Board v. Isbrandtsen Co., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926, 1958 and its feared impact on the dual rate contract system. By successive acts the decision was suspended in limbo while Congressional investigations went forward which culminated in the 1961 enactment, Pub:L. 87–346, Oct. 3, 1961, 75 Stat. 764, thought by some to be both a Congressional repudiation of domestic antitrust policies and a legislative overruling, at least in part, of Isbrandtsen. See Rep. 860, 87 Cong. 1st Sess. H.Rep. 498, 87 Cong. 1st Sess. Conference Report, H.

R. No. 1247, 87 Cong. 1st Sess., U.S.Code Cong. & Admin.News, 1961, p. 3108.

4. Former § 18 (46 U.S.C.A. § 817) was left intact as new subsection (a) and to it was added new subsection (b):

* * * * *

"(b) (1) From and after ninety days following October 3, 1961 every common carrier by water in foreign commerce and every conference of such carriers shall file with the Commission and keep open to public inspection tariffs showing all the rates and charges of such carrier or conference of carriers for transportation to and from United States ports and foreign ports between all points on its own route and on any through route which has been established. Such tariffs

No such problems arise under the Intercoastal Shipping Act since, as with domestic carriers generally, it had long called for tariffs reflecting the only basis for charges.[5]

The statutory definition of "common carrier"—such as it is—in the Shipping Act of 1916 applies to both.[6] Actually the statutory provision is concerned primarily with defining the categories of "foreign," "interstate," "water carrier," since the expressed standard of reference is that of a "common carrier," not who is a common carrier.[7] To this absence of

shall plainly show the places between which freight will be carried, and shall contain the classification of freight in force, and shall also state separately such terminal or other charge, privilege, or facility under the control of the carrier or conference of carriers which is granted or allowed, and any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, or charges, and shall include specimens of any bill of lading, contract of affreightment, or other document evidencing the transportation agreement. Copies of such tariffs shall be made available to any person and a reasonable charge may be made therefor. * * *

\* \* \* \* \*

"(3) No common carrier by water in foreign commerce or conference of such carriers shall charge or demand or collect or receive a greater or less or different compensation for the transportation of property or for any service in connection therewith than the rates and charges which are specified in its tariffs on file with the Commission and duly published and in effect at the time; nor shall any such carrier rebate, refund, or remit in any manner or by any device any portion of the rates or charges so specified, nor extend or deny to any person any privilege or facility, except in accordance with such tariffs.

\* \* \* \* \*

"(6) Whoever violates any provision of this section shall be liable to a penalty of not morethan $1,000 for each day such violation continues, to be recovered by the United States in a civil action."

It seems incongruous that former § 18 (now subsection (a)) with its *maximum* tariff and charges would be retained. There is no explanation in the legislative history as to this incomprehensible aberration.

5. The Intercoastal Shipping Act of 1933 provides:
Section 2 (46 U.S.C.A. § 844):
"Every common carrier by water in intercoastal commerce shall file with the Federal Maritime Board and keep open to public inspection schedules showing all the rates, fares, and charges for or in connection with transportation between intercoastal points on its own route; and, if a through route has been established, all the rates, fares, and charges for or in connection with transportation between intercoastal points on its own route and points on the route of any other carrier by water.

" * * * From and after ninety days following March 3, 1933, no person shall engage in transportation as a common carrier by water intercoastal commerce unless and until its schedules as provided by this section have been duly and properly filed and posted; nor shall any common carrier by water in intercoastal commerce charge or demand or collect or receive a greater or less or different compensation for the transportation of passengers or property or for any service in connection therewith than the rates, fares, and/or charges which are specified in its schedules filed with the Federal Maritime Board and duly posted and in effect at the time; nor shall any such carrier refund or remit in any manner or by any device any portion of the rates, fares, or charges so specified, nor extend or deny to any person any privilege or facility, except in accordance with such schedules. * * * "

"Any violation of any provision of this section by a common carrier by water in intercoastal commerce shall be punished by a fine of not less than $1,000 nor more than $5,000 for each act of violation and/or for each day such violation continues, to be recovered by the United States in a civil action." In 1965 this was amended to conform the penalties to the Shipping Act (see note 4 supra).

6. Under the Intercoastal Shipping Act this is done expressly by § 5 (46 U.S.C.A. § 845b) which provides: "The provisions of this chapter are extended and shall apply to every common carrier by water in interstate commerce, as defined in section 801 of this title."

7. Section 1 Shipping Act of 1916 (46 U.S. C.A. § 801) provides:
"When used in this chapter:
"The term 'common carrier by water in foreign commerce' means a common car-

a clearly defined legislative delineation must be added a further complication. Expressly excluded from the category of common carrier by water in foreign commerce is—in the colorful language of the sea—"a cargo boat commonly called an ocean tramp." (See note 7 supra).[8]

But this neither stymies nor complicates regulation. First, Congress in related legislation, spelled out in codal form[9] the traditional notion of what constitutes common carrier service. And the law has long recognized that except for those instances in which the peculiarities of water borne commerce call for specialized treatment the concepts traditionally applied in domestic common carrier transportation situations are to apply to foreign water commerce.[10] More than that, Congress, as has everyone else through the centuries of the common law, knows that all know what a common car-

rier is. So well known is it that we once described it in this fashion: "It is ironic that in a field now so thoroughly fenced in by state and federal legislative declarations of policy, in the journey we make for solution, we must work with ancient markers whose general fitness is reflected by their adaptability to the changing world of commerce and transportation. Indeed, at one point in the trip as we leave the broad superhighway with its temptations toward high compression freewheeling adjudication and proceed down the narrow one-way lane of Erie [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188], we must pay at least a wayside stop to consider whether a Mississippi mule and wagon decision fixes the law for the internal combustion day as well. * * * The salient characteristic of a common carrier is that 'He must be engaged in the business of carry-

rier, except ferryboats running on regular routes, engaged in the transportation by water of passengers or property between the United States or any of its Districts, Territories, or possessions and a foreign country, whether in the import or export trade: *Provided*, That a cargo boat commonly called an ocean tramp shall not be deemed such 'common carrier by water in foreign commerce.'

"The term 'common carrier by water in interstate commerce' means a common carrier engaged in the transportation by water of passengers or property on the high seas or the Great Lakes on regular routes from port to port between one State, Territory, District, or possession of the United States and any other State, Territory, District, or possession of the United States, or between places in the same Territory, District, or possession.

"The term 'common carrier by water' means a common carrier by water in foreign commerce or a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port."

\* \* \* \* \*

8. Presumably tramps are limited to the foreign trade. No such dispensation exists as to interstate water carriers (see note 7 supra).

9. The Transportation Act of 1940, 49 U.S. C.A. § 1 et seq., in Part III, § 902(d) defines "common carrier by water" as:

" * * * any person which holds itself out to the general public to engage in the transportation by water in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation * * *."

10. See United States Nav. Co. v. Cunard S.S. Co., 284 U.S. 474, 480, 52 S.Ct. 247, 249, 76 L.Ed. 408:

"When the Shipping Act was passed, the Interstate Commerce Act had been in force in its original form or in amended forms for more than a generation. Its provisions had been applied to a great variety of situations, and had been judicially construed in a large number and variety of cases. * * * In its general scope and purpose, as well as in its terms, that act closely parallels the Interstate Commerce Act; and we cannot escape the conclusion that Congress intended that the two acts, each in its own field, should have like interpretation, application, and effect. It follows that the settled construction in respect of the earlier act must be applied to the later one, unless, in particular instances, there be something peculiar in the question under consideration, or dissimilarity in the terms of the act relating thereto, requiring a different conclusion;" see also Greater Baton Rouge Port Comm. v. United States, 5 Cir., 1961, 287 F.2d 86, 89 and n. 3.

ing goods for others as a public employment, and must hold himself out as ready to engage in the transportation of goods for persons generally * * * [and] holds himself out as ready to engage in the transportation of goods for hire as a public employment, * * * and * * *, undertakes to carry for all persons indifferently * * *,' 13 C.J.S. Carriers § 3. And to state it conversely, those who ' * * * do not hold themselves out as willing to serve the public indiscriminately, are not common carriers; * * *,' 13 C.J.S. Carriers § 8. Hornsby v. Logaras, 210 Miss. 512, 49 So.2d 837: * * * " [11] Another time we said this: "There are many ways to say it, but none is better than the familiar one that 'the distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently * * *.' 9 Am.Jur., Carriers, §

4, p. 431." Semon v. Royal Indemnity Co., 5 Cir., 1960, 279 F.2d 737, 739.

And the traditional phrasing that a common carrier is "one who undertakes for hire to transport from place to place the property of others who may choose to employ him * * *." State of Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211, 45 S.Ct. 41, 72 L.Ed. 241 is echoed by administrative agencies [12] charged with the statutory duty of regulating water carriers,[13] with no necessity, as apparently supposed by the Trial Judge, that there be some specific solicitation in [14] connection with the maintenance of some "predetermined" and "regular" schedule of sailings.[15]

By any or all standards the Carrier's operations of its M/V Zaida was that of a common carrier in foreign

---

11. The Home Ins. Co. v. Riddell, 5 Cir. 1958, 252 F.2d 1, 2, 4.

12. The relevant functions of the Federal Maritime Board were transferred to the Federal Maritime Commission by section 103(b) of 1961 Reorganization Plan no. 7, effective August 12, 1961, 26 F.R. 7315, 75 Stat. 840, set out as a note to 46 U.S.C.A. § 1111.

13. See these decisions cited by the Government under the Shipping Act: Consolo v. Grace Line, Inc., 4 F.M.B. 293, 300 (1953); Galveston Chamber of Commerce v. Saguenay Terminals, 4 F.M.B. 375, 378 (1954); Banana Distributors, Inc v. Grace Line, 5 F.M.B. 615, 620 (1959), affirmed *sub nom.* Grace Line, Inc. v. F.M.B., 280 F.2d 790 (C.A.2), certiorari denied, 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365; Transportation— U.S. Pacific Coast and Hawaii, 3 F.M.B. 190, 197 (1950): "One transporting goods from place to place for hire, for such as see fit to employ him, whether usually or occasionally, whether as a principal or an incidental occupation, is a common carrier."

14. A carrier need not solicit cargo to be a common carrier. Transportation—U.S. Pacific Coast and Hawaii, 3 F.M.B. 190, 196 (1950); it is sufficient that the carrier "became known generally throughout the trade as plannning to transport

merchandise, and did transport merchandise of others * * * to the extent of its capacity." Transportation by Mendez & Co., Inc., Between U.S. and Puerto Rico, 2 U.S.M.C. 717, 720 (1944). Carriers are held to be common if they have "held out, by a course of conduct, that they would accept goods from whomever offered to the extent of their ability to carry." Transportation by Southeastern Terminal & S.S. Co., 2 U.S.M.C. 795, 796 (1946).

15. Neither regularity nor pre-determination is an essential element of common carriage. Unlike interstate common carriage as to which § 801 does specify "regular routes" (see note 7 supra) the Shipping Act neither mentions nor suggests such an element. There is no such requirement in the definition of common carriage in *foreign commerce.* Common carriage in foreign commerce means simply common carriage at common law —without any requirement that the carrier operate "on regular routes." Rates of General Atlantic S.S. Corp., 2 U.S. M.C. 681, 684 (1943). And the administrative agency has long held that a common carrier need not operate on "stated schedules." Alaskan Rates, 2 U.S.M.C. 558, 581 (1941); Transportation—U.S. Pacific Coast and Hawaii, 3 F.M.B. 190, 196 (1950).

commerce.[16] Inward and outward Customs manifests reflected hundreds of shipments of a wide variety of cargo running the gamut from automobiles, buses, groceries, gas ranges, freezers to veils and hat linings. Shipments of this kind had come from active solicitation by the Carrier among established freight forwarders whose compensation frequently came from the fees paid by the Carrier.[17] And all the while, during a 28 month period the M/V Zaida with a regularity almost matching the Staten Island Ferry made 28 round trips from Miami to the Dominican Republic.

In the face of this and the appropriate standards the Trial Court's finding that the government had failed to show that the Carrier "had any pre-arranged definite schedule to make these trips, or that any definite and regular schedule was maintained" was irrelevant and its further finding that the Carrier "solicited cargo from shippers and freight forwarders, and then sent its ships to those places to which the owners of the cargo directed him" was factually clearly unsupported. Actually, of course, the Judge did not make such findings on the evidence as such. Rather, he did it on the evidence measured against the pleading allegation of common carriage between Miami and "Central and South American ports." Consequently to sustain the findings we must sustain the ruling of a fatal variance between pleading and proof and the refusal to allow the Government to amend its complaint.

■ But "it is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities." Foman v. Davis, 1962, 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222. Whether we would go so far as the Second Circuit that the effect of F.R.Civ.P. 15(b) "is mandatory, not merely permissive" [18] we are committed to "* * *

16. Being a common carrier in foreign commerce neither the Carrier nor the M/V Zaida qualify as an exempt "tramp." See notes 7 and 8 supra. Just what is an ocean tramp we need not decide. The Maritime Commission expanded the figuratives in its colorful definition.

An ocean tramp is,
"as stated in our Report on Tramp Shipping Service, 75th Congress, 3rd Session, House Document No. 520, page 1 (1938), a 'free lance' that has 'earned its name from its gypsy-like existence,' and in addition to having no regular time of sailing has 'no fixed route and is ever seeking those ports where profitable cargo is most likely to be found.' Rates of General Atlantic S.S. Corp., 2 U.S. M.C. 681, 683 (1943).

The Agency has emphasized the significance of multishipper cargo. A tramp
"is a carrier transporting on any one voyage cargo supplied by a single shipper only under a single charter party or contract of affreightment. The best example of such a carrier is the tanker." Section 19 Investigation, 1935, 1 U.S.S. B.B. 470, 498 (1935). The fact "that * * * vessels carried a variety of commodities for numerous shippers radically differentiates them from those coming within the definition [of an 'ocean tramp']." Transportation—U.S. Pacific Coast and Hawaii, 3 F.M.B. 190, 199 (1950); see Brown & Williamson Tobacco Corp. v. S.S. Anghyra, E.D.Va.1957, 157 F.Supp. 737, 750–752, aff'd in part 4 Cir., 1959, 277 F.2d 9.

Of course, the most perverse nautical tramp by going on berth to accept cargo from all alike could become a common carrier.

17. See 46 U.S.C.A. § 841b regulating and licensing ocean freight forwarders and especially sub. par. (e) allowing payment of compensation by common carriers by water (as amended 1961, Pub.L. 87–254 § 2, 75 Stat. 522; 1961 U.S.Code and Adm.News, p. 2699).

18. In S.E.C. v. Rapp, 2 Cir., 1962, 304 F.2d 786, 790, the district court dismissed a complaint for failure to conform to the proof, and denied the S.E.C.'s motion to amend. Reversing, the Court held:
"* * * This ruling was clearly in error. F.R. 15(b) provides that '[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.' This is mandatory, not merely permissive. The rule then provides

a course of 'strong liberality $*$ $*$ $*$ in allowing amendments.'" Hall v. National Supply Co., 5 Cir., 1959, 270 F.2d 379, 383. To rule otherwise would be to frustrate the "affirmative policy" of F.R.Civ.P. 15(b), Lone Star Motor Import, Inc. v. Citroen Cars Corp., 5 Cir., 1961, 288 F.2d 69, 75.

Detailed answers by the Government to the Carrier's interrogatories plus the pretrial production of Customs' manifests told the Carrier what it, better than anyone else, already knew about its own operations. To this was added the uncontradicted testimony of a half-dozen freight forwarder live swearers. Not a cheep of an objection was ever sounded that evidence concerning the Dominican Republic was beyond the scope of "Central and South American" pleadings. There was, in the words of F.R.Civ.P. 15(b) a trial of the issue "by express or implied consent." And as in June T., Inc. v. King, 5 Cir., 1961, 290 F.2d 404, 407, 1961 A.M.C. 1431, "[t]here can be no suggestion here of surprise or unfair advantage or any inability to meet adequately a new issue." We can appreciate the Judge's impatience with such unseeworthy, United States Lines, Inc. v. Williams, 5 Cir., 365 F.2d 332, 336, prep-

aration but the only surprise was, we venture, the Carrier's surprise at winning on the pleadings. Skeletons would rattle, O'Neal v. United States, 5 Cir. 1959, 264 F.2d 809, 814 (dissenting), were this ruling to stand.

But on the Intercoastal Shipping Act count [19] we think that the Judge's fact findings meet the Plimsoll mark of F.R.Civ.P. 52(a). Only about ten shipments were involved, mostly of refrigerated cargoes generated by McDonald. Whether it was the Carrier or McDonald who was acting in the capacity of the transporter *vis-a-vis* the cargo [20] was a hotly disputed question. The Court could have found that it was the Carrier but it was not compelled to. In the Government's evidentiary structure there were a lot of loose ends. And that is the bitter end as well. S/S Bethflor v. Thomas, 5 Cir., 1967, 364 F.2d 634, 637.

The upshot is that the case must now go back for the Court, after such further hearing as is appropriate, to fix the penalties for violating § 18(b) (6), 46 U.S.C.A. § 817(b) (6).

Affirmed in part.

Reversed and remanded in part.

---

for free or delayed amendment, but states that 'failure so to amend does not affect the result of the trial of these issues.' Indeed, formal amendment is needed only when evidence is objected to at trial as not within the scope of the pleadings. And no objection on grounds of unfair surprise was or could have been made here; for, prior to trial, the S.E.C. made available to defense counsel the questionnaires it received in the investigation of the case which covered the expected testimony. The well known objective of the rule that cases should be decided on resolution of the actual dispute between the parties, rather than on the paper pleadings filed at the inception of suit, was thus frustrated."

19. The Act extends to ocean transportation between United States ports and its territories. 46 U.S.C.A. § 845b Note 6 supra. Such transportation is excluded from Part III, Transportation Act of 1940, 49 U.S.C.A. § 901 et seq. by virtue of the definitions of "interstate or foreign" transportation or commerce, § 902 (i) (1) (2) (3) ; and § 920(a).

20. If McDonald were in effect a space charterer, he could be the carrier, contract or common. See Agricultural Trans. Ass'n of Texas v. King, 5 Cir., 1965, 349 F.2d 873, 880–881; Cf. Brown & Root, Inc. v. Am. Home Assur. Co., 5 Cir., 1965, 353 F.2d 113, 117.