# United States Court of Appeals
## For the First Circuit

No. 23-2094

LUIS F. BONNET and CARLOS R. BENÍTEZ MALDONADO,

Petitioners,

v.

MICHAEL GORDON WHITAKER, Administrator of the Federal Aviation
Administration, and FEDERAL AVIATION ADMINISTRATION,

Respondents.

PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL TRANSPORTATION SAFETY BOARD

Before

Kayatta, Selya, and Aframe,
Circuit Judges.

Carlos A. Mercado-Rivera, with whom Mercado-Rivera Law
Offices was on brief, for petitioners.
Brett D. Weingold, Manager, Appellate Practice, Aviation
Litigation Division, Office of the Chief Counsel, Federal Aviation
Administration, for respondents.

September 25, 2024

**SELYA**, **Circuit Judge**.  The anthem of the United States Air Force famously describes the sky as "the wild blue yonder." Robert MacArthur Crawford, The U.S. Air Force (1947).  In fact, though, the skies over which the United States has jurisdiction are heavily regulated, and pilots must conform their conduct to those regulations or suffer the consequences.

Commercial flights are no exception.  They are subject to a web of regulations administered by the Federal Aviation Administration (FAA).  Here, two pilots — petitioners Luis F. Bonnet and Carlos R. Benítez Maldonado — challenge an order of the National Transportation Safety Board (NTSB or the Board), which upheld a 270-day suspension of each pilot's license by the FAA for piloting flights as air carriers or commercial operators without the required certificates.  See 14 C.F.R. § 119.1; id. Part 135 (Part 135).  Concluding, as we do, that the FAA appropriately characterized the flights in question and imposed reasonable sanctions, we deny the petition for review.

**I**

We briefly rehearse the relevant facts (many of which have been stipulated by the parties) and then chronicle the travel of the case.

**A**

These proceedings implicate a number of flights that took place in April and May of 2019.  Both of the petitioners were

pilots employed by Benítez Aviation, Inc. (BAI), which was the parent company of Blue Aviation, LLC, a company licensed to conduct commercial helicopter operations. Benítez did double duty, serving not only as a pilot but also as the president of BAI. Each petitioner held Airline Transport Pilot (ATP) certificates, which is the highest level of pilot certification issued by the FAA.

At the time of the flights in question, BAI managed a Cessna model 650, registration number N51JV (N51JV), that was owned by Sky Global, LLC. N51JV required two crewmembers to operate the aircraft, had a passenger-seat configuration of up to twenty seats, and had a payload capacity of 6,000 pounds or less.

Bonnet acted as pilot-in-command (PIC) of N51JV on an April 17 flight from San Juan to Simpson Bay, Sint Maarten and an April 22 flight from Simpson Bay to San Juan (collectively, the April flights). Rudy Ghazal — also a BAI employee — was Bonnet's second-in-command (SIC) on these flights. In addition, Bonnet acted as PIC for a May 23 flight from San Juan to Cozumel, Mexico, and then on to Veracruz, Mexico and a May 24 flight from Veracruz to Santo Domingo, Dominican Republic (collectively, the May flights). Benítez served as Bonnet's SIC for the May flights. Each petitioner received his regular salary — but no incremental compensation — for the time periods that encompassed these flights.

**B**

On September 27, 2019, the FAA notified the petitioners through a Notice of Proposed Certificate Action that the FAA proposed to suspend their ATP certificates for 270 days. The FAA alleged that the petitioners operated the April and May flights either as direct air carriers or as commercial operators, carrying at least one passenger for compensation or hire on each flight without the proper training or certificates for that type of flight. On July 30, 2020, the FAA issued orders of suspension for violations of 14 C.F.R. §§ 91.13(a), 119.5(g), 119.33(a)(2), 119.33(a)(3), 119.33(b)(2), 119.33(b)(3), 135.293(a), 135.293(b), and 135.299(a).[1]

The petitioners appealed the proposed suspensions to the NTSB, see 49 U.S.C. §§ 1133(a)(1), 44709(d), and a hearing was held before an administrative law judge (ALJ). The parties called witnesses, and a sheaf of documents was introduced into evidence on motion of the FAA Administrator (the Administrator). The Administrator also called witnesses, including — among others — Belkys Perez (Benítez's wife and a corporate officer of BAI), Fred Gallo (who booked the April flights), Shamil Sandoval Colón (who booked the May flights), and Rafael Muñiz (a passenger on the May

---

[1] The text of these regulations appears in Appendix A, infra.

flights).  The petitioners themselves testified and called Ghazal and Perez as witnesses.

The documents admitted at the hearing disclose that Gallo purchased the April flights for $10,500 and paid for them in advance.  The invoice for those flights indicates that the amounts billed were for "Airplane Operational Cost."  The record further shows that Muñiz procured the May flights on behalf of GSR Management, LLC (GSR) for $36,500 and paid for those flights in advance.  The invoice for the May flights indicates that the amounts billed were for "Airplane Transportation."  Each of the flights had eight passengers on board.

Perez testified as to her general knowledge of BAI's operations.  She stated that she handled administrative matters for the company, including flight bookings.  According to her testimony, she and Benítez never discussed BAI's business at home.  Finally, she admitted that in "emergencies" — a term that she never attempted to define — BAI provided flights to "friend[s] or . . . friend[s] of a friend," but she suggested that the company typically attempted to refer these callers to firms licensed to conduct commercial passenger flights.  The ALJ found that Perez's testimony was not credible, as it was inconsistent and non-responsive.

With respect to the April flights, Gallo credibly testified that he received the telephone number of BAI from a

"client and friend." The parties stipulated that this individual was Farhad Ghaffar. Gallo said that he had never flown with BAI before. When he received the telephone number from Ghaffar, he called the office and told BAI what he wanted. BAI quoted him a price. Gallo did not testify that he mentioned his friendship with Ghaffar in his exchanges with BAI. For her part, Perez insisted that Ghaffar was close friends with Benítez and herself. She acknowledged, though, that this friendship started through their aviation business, admitting that Ghaffar was first a "client, a customer, for the helicopters."

As for the May flights, Sandoval Colón testified that she was an administrative assistant for Prolat Entertainment, which provided services to GSR. She recounted that she was discussing the difficulty that she had in finding a flight for GSR when an acquaintance — who did not work at Prolat Entertainment but was visiting the Prolat Entertainment facility — overheard her conversation and referred her to BAI. Relatedly, Muñiz testified that, as the owner of Prolat Entertainment, he instructed Sandoval Colón to book the flights upon this recommendation. Sandoval Colón reached out to Benítez, who referred her to Perez for the booking. As matters turned out, Muñiz was one of the passengers on the May flights — but he did not speak to the pilots or any other representative of BAI prior to the flights. The ALJ found both Muñiz and Sandoval Colón to be credible.

After mulling this evidence, the ALJ upheld the FAA's suspension order. The petitioners appealed the ALJ's order to the Board, which affirmed. See Whitaker v. Bonnet, NTSB Ord. No. EA-5962 (Oct. 27, 2023). The NTSB held that the flights were subject to the requirements for air carriers or commercial operators because BAI was acting as a common carrier; that the ALJ appropriately found a residual violation of 14 C.F.R. § 91.13(a);[2] that the ALJ did not exhibit bias; and that the sanction — a 270-day suspension — was supportable.

This timely petition for judicial review followed.

## II

We begin our analysis by offering a decurtate summary of the applicable regulations. "Under the Federal Aviation Act, the FAA Administrator holds responsibility for flight safety in civil air commerce." Rochna v. NTSB, 929 F.2d 13, 14 (1st Cir. 1991). The FAA requires pilots providing commercial flight services to the public to satisfy certain regulatory criteria. See Decruz v. Elwell, 751 F. App'x 1, 2 (D.C. Cir. 2018). The stringency of the criteria applied varies depending upon the type of flight.

14 C.F.R. Part 91 (Part 91) describes the general minimum operating and flight rules that must be followed. Under 14 C.F.R.

---

[2] A residual violation is one that is "predicated on violations of other regulations." GoJet Airlines, LLC v. FAA, 743 F.3d 1168, 1172 (8th Cir. 2014).

§ 119.1, persons operating or intending to operate civil aircraft as "an air carrier or commercial operator" must adhere to additional requirements — the ones applicable here being those described in Part 135.

An "air carrier" is defined as "a person who undertakes directly by lease, or other arrangement, to engage in air transportation." 14 C.F.R. § 1.1. In turn, "[a]ir transportation" is defined as "interstate, overseas, or foreign air transportation or the transportation of mail by aircraft." Id. "Foreign air transportation" is defined as "the carriage by aircraft of persons . . . as a common carrier for compensation or hire . . . in commerce between a place in the United States and any place outside of the United States, whether that commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation." Id.

A "commercial operator" is "a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property, other than as an air carrier." Id. When common carriage is not involved (that is, when a flight is operated by a "commercial operator" rather than an "air carrier"), the flight is not subject to the rules under Part 135 as long as it qualifies for one of the exceptions listed in 14 C.F.R. § 91.501(b). See Appendix A, infra.

The NTSB "possesses jurisdiction to review certain [FAA] orders, including . . . order[s] of suspension [of pilot certificates]." See Moshea v. NTSB, 570 F.3d 349, 351 (D.C. Cir. 2009). The Federal Aviation Act authorizes review of orders issued by the FAA and reviewed by the NTSB in "the court of appeals of the United States for the circuit in which [the petitioners] reside[] or ha[ve] [their] principal place of business." 49 U.S.C. § 46110(a). Because the petitioners reside in Puerto Rico, this court has jurisdiction over the instant petition.

As a reviewing court, our role is tightly circumscribed. "Under our very narrow standard of review, we must uphold the Board's decision if it is not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Hite v. NTSB, 991 F.2d 17, 20 (1st Cir. 1993) (quoting 5 U.S.C. § 706(2)(A)).

"The Federal Aviation Act provides that for purposes of review by the courts of appeals '[t]he findings of fact by the [NTSB], . . . if supported by substantial evidence, shall be conclusive.'" Twomey v. NTSB, 821 F.2d 63, 67 n.5 (1st Cir. 1987) (first alteration in original)(quoting 49 U.S.C. § 1486(e)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 718 (1st Cir. 1999) (quoting

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)); accord Quinn v. Hinson, 107 F.3d 1 (Table), at *3 (1st Cir. 1996). Under the substantial evidence test, "we simply determine whether the agency could fairly and reasonably find the facts as it did." Hite, 991 F.2d at 18 n.1 (quoting Chritton v. NTSB, 888 F.2d 854, 856 (D.C. Cir. 1989)). "[S]ubstantial evidence to support an agency finding may exist 'even though suggested alternative conclusions may be equally or even more reasonable and persuasive.'" Removatron Int'l Corp. v. FTC, 884 F.2d 1489, 1496 (1st Cir. 1989) (alteration in original) (quoting Montgomery Ward & Co. v. FTC, 691 F.2d 1322, 1327 (9th Cir. 1982)); accord Quinn, 107 F.3d 1 (Table), at *3. When there is conflicting testimony, "[i]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [ALJ]." Rodriguez v. Sec'y of Health & Hum. Servs., 647 F.2d 218, 222 (1st Cir. 1981) (first alteration in original) (quoting Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)).

## IV

The NTSB's decision hinges on the FAA's determination that the petitioners piloted the April and May flights without possessing the certifications required under Part 135. The petitioners posit that the NTSB's analysis was misguided because the flights should have been governed by the requirements of Part 91 (not Part 135). They are foraging in an empty cupboard.

- 10 -

The FAA argues persuasively that the petitioners were acting as "air carriers," a term which — as discussed above — imputes the subject's status as a "common carrier." See Flytenow, Inc. v. FAA, 808 F.3d 882, 886 (D.C. Cir. 2015). Even though the statute does not define "common carrier," it is a "well-known term that comes . . . from the common law." CSI Aviation Servs., Inc. v. U.S. Dep't of Transp., 637 F.3d 408, 415 (D.C. Cir. 2011).

The FAA relies on a definition of "common carrier" that is provided in a 1986 Advisory Circular. See Flytenow, Inc., 808 F.3d at 886 (citing FAA, Advisory Circular 120-12A, Private Carriage Versus Common Carriage of Persons or Property (1986)(FAA Advisory Circular)). The elements of "common carriage" as defined in the FAA Advisory Circular are "(1) a holding out of a willingness to (2) transport persons or property (3) from place to place (4) for compensation." Id. at 886-87.

The FAA Advisory Circular is not binding on this court. Regardless, we hold that the FAA's definition largely comports with our historical understanding of the term. We have interpreted the term "common carrier," in pertinent part, as describing an entity that "provides its services indiscriminately to any[one] who wants them." Fayard v. Ne. Vehicle Servs., LLC, 533 F.3d 42, 46 (1st Cir. 2008). Other courts of appeals have read the term as encompassing a "commercial transportation enterprise that 'holds itself out to the public'" as willing to transport persons or

- 11 -

property for compensation. CSI Aviation Servs., 637 F.3d at 415 (quoting Common Carrier, Black's Law Dictionary (8th ed. 2004)); see N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 251 (3d Cir. 2007) ("Susquehanna holds itself out . . . [and] does, in fact, haul waste for multiple customers; and there is no evidence of it turning away a customer."). Notwithstanding the differences in wording, our definition of "common carrier" accords with the definitions employed by our sister circuits. And our sister circuits have similarly held — as do we — that the FAA Advisory Circular's definition is consistent. See Woolsey v. NTSB, 993 F.2d 516, 523 (5th Cir. 1993) (concluding that FAA Advisory Circular definition of "common carrier" is "in relevant respect the same as that found at common law").

In the case at hand, the record makes manifest that the April and May flights transported persons from place to place, and these two elements are not disputed by any party. The two pivotal questions, then, are whether there was a "holding out" and whether the flights were "for compensation." If substantial evidence supports a conclusion that both of these criteria are satisfied, then the NTSB appropriately found that the flights were operated by a common carrier. We turn next to those questions.

## A

We start with the question of whether the FAA proved by substantial evidence a "holding out." Neither the statute nor any

- 12 -

regulation defines "holding out." To fill this void, the FAA relies on the common law meaning of this term. Flytenow, Inc., 808 F.3d at 892. Thus, the holding out may be "either by advertising or by actually engaging in the business of carriage for hire." Arrow Aviation, Inc. v. Moore, 266 F.2d 488, 490 (8th Cir. 1959); see Riegelsberger v. Air Evac EMS, Inc., 970 F.3d 1061, 1065 (8th Cir. 2020); United States v. Jones, 712 F.2d 1316, 1322 (9th Cir. 1983). The petitioners do not dispute the FAA's reliance on the common law meaning of "holding out."

Importantly, "[a] carrier need not solicit" paying passengers in order to be found to be "holding out." United States v. Stephen Bros. Line, 384 F.2d 118, 123 n.14 (5th Cir. 1967). To constitute holding out, "it is sufficient that the carrier 'became known generally'" as available to carry passengers for hire. Id. (quoting Transp. by Mendez & Co., Between U.S. and Puerto Rico, 2 U.S.M.C. 717, 720 (1944)). Put another way, "[c]arriers are held to be common if they have 'held out, by a course of conduct . . . .'" Id. (quoting Transp. by Se. Terminal & S.S. Co., 2 U.S.M.C. 795, 796 (1946)).

Both the ALJ and the Board found that the elements of "holding out" were present with respect to the April and May flights. They noted that different individuals on different occasions referred the passengers on the flights to BAI as an

- 13 -

enterprise that would be willing to provide them with transportation services. We agree.

The petitioners demur, emphasizing two points that they insist are fatal to a finding of "holding out." First, they claim that the passengers on the flights were "families and friends and relatives" of the aircraft's owners. But this testimony was deemed not credible by the ALJ, and the record makes manifest that it rests on an inaccurate view of the facts. In short, what the petitioners claim and what the record reveals are quite different.

Both petitioners testified that they had never flown with any of the passengers prior to the flights in question. So, too, when Perez — the person who completed the bookings — was questioned about whether she asked potential customers calling for a quote if they were the aircraft owners' family, friends, or friends of friends, she replied that she "do[es] not need to do that." This evidence, coupled with the testimony of Gallo, Sandoval Colón, and Muñiz indicating that they did not have a pre-existing relationship with BAI or the aircraft owners, makes pellucid that it was reasonable to find that BAI went well beyond transporting family and friends and held itself out as available to the public.

The petitioners' second riposte is no more persuasive. They point out that BAI did not advertise itself as operating commercial flights and that, therefore, the holding out

- 14 -

requirement was not satisfied.  The fact that they did not advertise seems to be borne out by the record — but it does not take the petitioners very far.  As the FAA has consistently stated, "[p]hysically holding out without advertising where a reputation to serve all is gained is sufficient to constitute an offer to carry all customers. . . . [T]he expression of willingness to all customers with whom contact is made that the operator can and will perform the requested service is sufficient."  FAA Advisory Circular.

This is such a case:  the finding that BAI had such a reputation was supported by substantial evidence.  For example, with respect to the May flights, the witness who booked the flights on behalf of the passengers testified that she was referred to BAI through "a casual conversation from an acquaintance at the office" who "overheard [the witness] discussing looking for a quote for a flight from San Juan to Veracruz and Veracruz to DR."  The acquaintance added that she should "just give Carlos Benítez, Benítez Aviation a call."  Accordingly, we conclude that substantial evidence supports the finding that there was a "holding out."

**B**

This brings us to the question of whether the FAA proved by substantial evidence the "compensation" element of the "common carrier" test.  The petitioners contend that the passengers were

billed solely for "operational costs" rather than for any profit to BAI. The record, however, contains substantial evidence to the contrary. For example, the invoice for the May flights does not indicate a breakdown in costs but simply lists charges for "Airplane Transportation." What is more, the flight invoices were paid in advance. Although Perez testified that she researched the costs before preparing the bills and that there was no profit, the ALJ supportably found that this testimony was not credible. Moreover, these invoices — as the ALJ again supportably found — could not have reflected the actual costs incurred. For instance, the actual costs for fuel could be determined only after the fuel was consumed.

In all events, a bill for operational costs is sufficient to establish the "for hire" element of the common carrier construct. "[T]here can be compensation where the payment covers only costs and no actual profit is shown." Administrator v. Rountree, 2 NTSB 1712, 1713-14 (1975). Consequently, even supposing that the amounts paid by the passengers were solely for costs and that BAI made no profit, these flights would still be deemed to have been operated for hire (and, thus, by a common carrier).

## C

We add a coda. Even if BAI did not "hold itself out" and, therefore, the flights were not operations by an air carrier,

that would not defeat the FAA's order. Part 135 applies to both air carriers and commercial operators. The "holding out" requirement does not pertain to commercial operators. The only criteria that need be met are that the flights be operated "for compensation or hire," 14 C.F.R. § 1.1, and not be subject to one of the exceptions in 14 C.F.R. § 91.501(b). The flights at issue here were manifestly operated for hire, and none of the exceptions (limned in Appendix A, infra) apply to them. It follows that the flights were at least flown by commercial operators and, thus, were subject to the requirements of Part 135. See Manin v. NTSB, 627 F.3d 1239, 1243 n.1 (D.C. Cir. 2011) ("[W]hen 'there is not the slightest uncertainty as to the outcome of a proceeding' on remand, courts can affirm an agency decision on grounds other than those provided in the agency decision." (quoting Envirocare of Utah, Inc. v. Nuclear Regul. Comm'n, 194 F.3d 72, 79 (D.C. Cir. 1999))).

## V

Of course, as the petitioners point out, it is their licenses that are at risk here. BAI is not a party to this proceeding. With this in mind, the petitioners argue that BAI's role supersedes any claim of liability against them: they contend that BAI's absence as a party is fatal to the case; that they lacked knowledge that the flights were Part 91 flights because BAI was in charge of the bookings and the petitioners were merely line

pilots; and that they did not receive compensation personally for the flights and, therefore, fall outside the ambit of Part 135. These contentions encounter strong headwinds.

**A**

The petitioners first argue that the NTSB lacked jurisdiction to issue the order from which they appeal because that order necessarily involved drawing factual conclusions regarding BAI — an entity that had neither been joined as a party nor subpoenaed to appear. This argument need not detain us.

As we already have made clear, see supra Part III, the NTSB has jurisdiction to review pilot-suspension orders issued by the FAA. See Moshea, 570 F.3d at 351. Although the general rule is that a tribunal lacks the power to make a binding adjudication of the rights of litigants not before it, see Hansberry v. Lee, 311 U.S. 32, 40 (1940), the NTSB has not offended that general rule in this instance. Even though certain factual findings made in this proceeding concern BAI, those findings do not bind BAI. Indeed, BAI has entered into a separate settlement with the FAA. See Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund, 582 F.3d 30, 42 (1st Cir. 2009) ("Due process 'obviously does not mean . . . that a court may never issue a judgment that, in practice, affects a nonparty.'" (alteration in original) (quoting Provident Tradesmens Bank & Tr. Co. v. Patterson, 390 U.S. 102, 110 (1968))).

- 18 -

If more were needed — and we doubt that it is — this claim appears, at bottom, to be a claim that BAI's due process rights have been infringed. BAI is not a party to this proceeding, and the petitioners have not alleged any facts sufficient to show that they have any right to assert third-party standing. See, e.g., Freeman v. Town of Hudson, 714 F.3d 29, 39 (1st Cir. 2013) (explaining that third-party standing requires hindrance to third party's ability to protect his or her own interests).

To the extent that the petitioners are arguing that there was a fatal failure to join BAI, that argument is untenable. Federal Rule of Civil Procedure 19(a)(1)(A) requires that a person be joined as a party only if, "in that person's absence, the court cannot accord complete relief among existing parties." Here, there is no reason why complete relief cannot be afforded in the absence of BAI. Not surprisingly, then, this type of case is routinely prosecuted and decided with just the pilots as the responding parties. See, e.g., Woolsey, 993 F.2d 516; Moshea, 570 F.3d 349.

**B**

BAI's role in orchestrating these flights — and the petitioners' claimed lack of knowledge of BAI's actions — does not aid the petitioners. The petitioners submit that BAI (through Perez) handled all administrative matters. Consequently, the petitioners say that they did not know whether the flights were being operated improperly. But pilots have a responsibility to

- 19 -

adhere affirmatively to the governing regulations. Under 14 C.F.R. § 91.3, a PIC of an aircraft is "directly responsible for, and is the final authority as to, the operation of that aircraft." The petitioners should have taken steps to learn what type of flight they were flying. See Cappello v. Duncan Aircraft Sales of Fla., Inc., 79 F.3d 1465, 1468 (6th Cir. 1996); Davis v. United States, 824 F.2d 549, 551 (7th Cir. 1987) ("The pilot . . . must be aware of those facts which are material to [the aircraft's] operation.") (quoting Redhead v. United States, 686 F.2d 178, 182 (3d Cir. 1982)).

Taking a struthious approach is not an effective defense. The petitioners cannot avoid these requirements by sticking their heads in the sand.

The record is replete with substantial evidence that the petitioners shirked this responsibility. For example, Bonnet stated to an FAA investigator that he did not "ask too many questions" about the passengers on the flights because he worked for "rich people." As for Benítez, the record demonstrates conduct well beyond a simple failure to inquire; it strongly suggests that he in fact knew the flights were not Part 91 flights. Perez admitted that she and Benítez were married, and the ALJ supportably found that her testimony that they did not discuss any administrative matters regarding Benítez's own company at home was not credible. And when Sandoval Colón reached out to BAI

initially, she spoke with Benítez.  He then referred her to Perez to complete her booking.  At a bare minimum, Benítez knew that callers were contacting BAI to book these types of flights and he facilitated that conduct.

## C

Relatedly, the petitioners posit that — because it was BAI that was paid for the flights — they were not operating the flights for compensation or hire.  Thus, they suggest that the Part 135 requirements are not applicable to them.

We do not agree.  As the FAA persuasively argues, once it has been shown that the flight was operated by a common carrier, the issue of whether the pilots themselves were directly compensated is not dispositive.

In all events, it is luminously clear that the pilots were compensated.  To begin, Benítez was — at all relevant times — the president of BAI.  It is self-evident that through this direct stake he was compensated for the flights.  And at any rate, for a pilot, the payment of his salary is sufficient to establish compensation.  See Las Vegas Hacienda, Inc. v. Civ. Aeronautics Bd., 298 F.2d 430, 440 (9th Cir. 1962) (rejecting argument that employee petitioner, acting as "salaried employee," should not have been subject to cease-and-desist order against corporate petitioner and holding that he was subject to Federal Aviation Act if he was engaged in air transportation).  Even though the

petitioners, qua pilots, were not paid extra, they were plainly conducting these flights in the ordinary course of their employment, for which they were paid. And the record establishes that the pilots were reimbursed for the costs incurred in conducting the flights, such as hotel stays. As we have said, such reimbursement, in and of itself, is sufficient to establish compensation. See Rountree, 2 NTSB at 1713-14. On this record, then, there was substantial evidence that both of the petitioners were compensated for the flights. The petitioners cannot hide behind BAI to escape the consequences of their own actions.

## VI

We turn to the remaining issues raised by the petitioners.

## A

The petitioners' argument that the NTSB erroneously found a residual violation of 14 C.F.R. § 91.13(a) is groundless. They argue that the FAA did not independently establish that the challenged conduct was careless or reckless. The agency responds that no such showing is necessary: a residual or derivative violation is inherently shown when pilots fail to comply with FAA operational regulations. Precedent staunchly supports the FAA's position. See Jackson v. NTSB, 114 F.3d 283, 287-88 (D.C. Cir. 1997); GoJet Airlines, LLC v. FAA, 743 F.3d 1168, 1172 (8th Cir. 2014); Administrator v. Clark, 7 NTSB 434, 436 (1990). We

therefore uphold the NTSB's ruling that the petitioners violated 14 C.F.R. § 91.13(a).[3]

**B**

The petitioners have another shot in their sling. They contend that the ALJ engaged in inappropriate conduct that demonstrated bias and affected the outcome of the appeal. We do not agree.

We first confront a threshold issue. The FAA argues that any objections to the ALJ's conduct are waived because they were not raised during the hearing. See 49 U.S.C. § 46110(d) (stating that courts of appeal "may consider an objection to the order of the [FAA] . . . only if the objection was made in the proceeding conducted . . . or if there was a reasonable ground for not making the objection in the proceeding"). The petitioners offer no reasonable explanation for this failure and, therefore, their objections are waived. See Gorman v. NTSB, 558 F.3d 580,

---

[3] In passing, the petitioners suggest that the FAA's allegation does not specify whether they were "careless" or "reckless," with the result that the "unprecise allegation" violates due process. It is not readily apparent how an allegation can violate due process. But we need not linger long over this query: a due process challenge to the NTSB's holding that the petitioners violated section 91.13(a) is plainly futile. Due process demands that the parties have "fair notice" of what is required by the applicable regulation. Draper v. Healey, 827 F.3d 1, 3-4 (1st Cir. 2016). In this instance, the petitioners had fair notice of what was required of them, which was simply to comply with the clear text of the other regulations cited by the FAA.

591 (D.C. Cir. 2009) ("Because Gorman failed to raise this objection before the NTSB, and offers no reasonable ground for this failure, we conclude that he has waived the objection.").

Even were we disposed to excuse the petitioners' waiver — and we are not — they have not carried their burden of showing bias. "An impartial decisionmaker is, of course, a fundamental component of due process." Beauchamp v. De Abadia, 779 F.2d 773, 776 (1st Cir. 1985). But "[a]bsent some showing of abuse, the ALJ is presumed free from bias," Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1112 (1st Cir. 1981), because of the "presumption that [adjudicators] are '[people of] . . . conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances,'" Bettencourt v. Bd. of Registration in Med., 904 F.2d 772, 780 n.10 (1st Cir. 1990) (quoting Withrow v. Larkin, 421 U.S. 35, 55 (1975)) (internal quotation marks omitted). See Valley v. Rapides Par. Sch. Bd., 118 F.3d 1047, 1052-53 (5th Cir. 1997) (holding that, to show bias, petitioners must overcome both "the presumption of honesty and integrity of the adjudicators" and "the presumption that those making decisions affecting the public are doing so in the public interest").

A charge of bias is not lightly to be embraced, and a showing of bias requires something more than merely showing that the adjudicator has not accorded the parties kid-glove treatment.

"'[R]emarks during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases' are usually insufficient to prove bias [, and t]he same is true of a court's 'expressions of impatience, dissatisfaction, annoyance, and even anger.'" United States v. Caramadre, 807 F.3d 359, 375 (1st Cir. 2015) (quoting Liteky v. United States, 510 U.S. 540, 555-56 (1994)). ALJs, in particular, must be allowed substantial latitude in conducting hearings and examining witnesses. See 49 C.F.R. § 821.35(b)(1), (8). Bias cannot be established merely by showing that "the ALJ interrupted the questioning and posed his own questions" when there is no evidence that "bias or prejudice stemmed from an 'extrajudicial source.'" Lackey v. FAA, 386 F. App'x 689, 694, 696 (9th Cir. 2010).

To show bias, then, the proponent must put some meat on the bones. Examples of when decisionmakers are "constitutionally unacceptable" by reason of bias include when they have a "direct, personal, and substantial pecuniary interest in the outcome of a case," N.Y. State Dairy Foods, Inc. v. Ne. Dairy Compact Comm'n, 198 F.3d 1, 13 (1st Cir. 1999), or when they have "been the target of personal abuse or criticism from the party before [them]," United States v. Pina, 844 F.2d 1, 13 (1st Cir. 1988) (quoting Withrow, 421 U.S. at 47).

In the case at hand, the petitioners accuse the ALJ of "assum[ing the] role of advocate for the FAA's case," thus

- 25 -

"revealing his bias." But the record belies this accusation: the petitioners point to no facts suggesting that the ALJ had a personal or pecuniary interest in the case. Nor do they identify any facts tending to show that he was the target of personal abuse or criticism by any of the parties. At bottom, they suggest no "extrajudicial source" influencing his conduct but, rather, simply recount instances in which he questioned witnesses to clarify the record. And in the instances identified by the petitioners, the ALJ gave both parties the opportunity to continue questioning and to rehabilitate the witnesses.

That ends this aspect of the matter. The ALJ's even-handed course of conduct was well within the proper sphere of his authority.[4] The allegation of bias is, therefore, wholly unsupported, and the petitioners' claim is dead on arrival.

## C

The petitioners' final plaint focuses on the sanction imposed. The ALJ ordered that the pilot's license of each petitioner be suspended for 270 days, and the NTSB affirmed that sanction. The petitioners complain that there was insufficient evidence of aggravating factors to justify so lengthy a sanction.

---

[4] This is especially true in administrative cases where the ALJ is the only adjudicator. Many of the authorities relied on by the petitioners, including United States v. Koerber, 10 F.4th 1083 (10th Cir. 2021), discuss criminal trials, with emphasis on the impact of the judge's conduct on the jury.

- 26 -

We reject this complaint and hold that the FAA's imposition of sanctions was appropriate.

Both the NTSB and this court must adhere to the FAA's remedy unless it is "unwarranted in law or is without justification in fact." Pham v. NTSB, 33 F.4th 576, 583 (D.C. Cir. 2022) (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 112-13 (1946)). The FAA typically relies on the publicly available FAA Order 2150.3C for selecting sanctions. Aggravating and mitigating factors listed in FAA Order 2150.3C include: the degree of hazard, violation history, level of certificate and experience, compliance disposition of the violator, whether the violation is isolated or repeated, subsequent corrective action, inadvertence of the violation, voluntary reporting of violations, and prior criminal convictions for similar conduct.

Viewed against this backdrop, the petitioners' complaint that the agency did not present sufficient evidence of aggravating factors to justify the 270-day suspension rings hollow. The record leaves no doubt that aggravating factors were present. These include that the April and May flights were transporting passengers, that the petitioners had ATP certificates, that they knew or should have known that the flights were undertaken without the appropriate certificates in place, and that the petitioners each flew multiple flights. Each of these facts was either included in the parties' stipulations or conclusively demonstrated

in the documentary record. The petitioners cannot now claim that there is insufficient evidence supporting these aggravating factors when they themselves agreed to the truth of these allegations before the NTSB.

The short of it is that the sanctions are not only compliant with FAA Order 2150.3C but also within the universe of reasonable sanctions for the petitioners' regulatory violations. After all, "[i]mplicit in the issuance of an [ATP] rating and certificate is [the FAA's] finding that the holder thereof possesses the degree of judgment required of a [PIC]." Specht v. Civ. Aeronautics Bd., 254 F.2d 905, 916 (8th Cir. 1958). When — as in this case — a pilot violates safety regulations without justification, a suspension is typically thought to be a condign remedy. See Rochna, 929 F.2d at 15 (expounding upon FAA's long history of using suspensions as "deterrence" for "violation[s] of [federal aviation regulations]" (quoting Pangburn v. Civ. Aeronautics Bd., 311 F.2d 349, 354 (1st Cir. 1962), then Hill v. NTSB, 886 F.2d 1275, 1281 (10th Cir. 1989)).

Here, moreover, the petitioners had the highest level of pilot certification, which implicitly comes with the highest level of responsibility. So, too, flying passengers, rather than cargo, comes with heightened expectations because of the risk to human life. The petitioners shirked these responsibilities on several occasions, each time failing to ensure that the flights that they

were conducting were consistent with the FAA's safety regulations. And — as the ALJ observed — revocation, rather than suspension, is a common sanction in these circumstances. Thus, we cannot say that the sanctions imposed are unwarranted at law or without justification in fact.

## VII

We need go no further. For the reasons elucidated above, the petition for review is


**Denied**.

Text of Code of Federal Regulations

14 C.F.R. § 91.13(a): "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."

14 C.F.R. § 119.5(g): "No person may operate as a direct air carrier or as a commercial operator without, or in violation of, an appropriate certificate and appropriate operations specifications. No person may operate as a direct air carrier or as a commercial operator in violation of any deviation or exemption authority, if issued to that person or that person's representative."

14 C.F.R. § 119.33(a)(2): "A person may not operate as a direct air carrier unless that person . . . [o]btains an Air Carrier Certificate."

14 C.F.R. § 119.33(a)(3): "A person may not operate as a direct air carrier unless that person . . . [o]btains operations specifications that prescribe the authorizations, limitations, and procedures under which each kind of operation must be conducted."

14 C.F.R. § 119.33(b)(2): "A person other than a direct air carrier may not conduct any commercial passenger or cargo aircraft operation for compensation or hire under part 121 or part 135 of this chapter unless that person . . . [o]btains an Operating Certificate."

14 C.F.R. § 119.33(b)(3): "A person other than a direct air carrier may not conduct any commercial passenger or cargo aircraft operation for compensation or hire under part 121 or part 135 of this chapter unless that person . . . [o]btains operations specifications that prescribe the authorizations, limitations, and procedures under which each kind of operation must be conducted."

14 C.F.R. § 135.293(a): "No certificate holder may use a pilot, nor may any person serve as a pilot, unless, since the beginning of the 12th calendar month before that service, that pilot has passed a written or oral test, given by the Administrator or an authorized check pilot, on that pilot's knowledge [on specified subjects]."

14 C.F.R § 135.293(b): "No certificate holder may use a pilot, nor may any person serve as a pilot, in any aircraft unless, since

the beginning of the 12th calendar month before that service, that pilot has passed a competency check given by the Administrator or an authorized check pilot in that class [or type] of aircraft."

14 C.F.R. § 135.299(a): "No certificate holder may use a pilot, nor may any person serve, as a pilot in command of a flight unless, since the beginning of the 12th calendar month before that service, that pilot has passed a flight check in one of the types of aircraft which that pilot is to fly."

14 C.F.R. § 91.501(b): "Operations that may be conducted under the rules in this subpart instead of those in parts 121, 129, 135, and 137 of this chapter when common carriage is not involved, include — . . .

> (3) Flights for the demonstration of an airplane to prospective customers when no charge is made except for those specified in paragraph (d) of this section;
>
> (4) Flights conducted by the operator of an airplane for his personal transportation, or the transportation of his guests when no charge, assessment, or fee is made for the transportation;
>
> (5) Carriage of officials, employees, guests, and property of a company on an airplane operated by that company, or the parent or a subsidiary of the company or a subsidiary of the parent, when the carriage is within the scope of, and incidental to, the business of the company (other than transportation by air) and no charge, assessment or fee is made for the carriage in excess of the cost of owning, operating, and maintaining the airplane, except that no charge of any kind may be made for the carriage of a guest of a company, when the carriage is not within the scope of, and incidental to, the business of that company;
>
> (6) The carriage of company officials, employees, and guests of the company on an airplane operated under a time sharing, interchange, or joint ownership agreement as defined in paragraph (c) of this section; . . .
>
> (9) The carriage of persons on an airplane operated by a person in the furtherance of a business other than transportation by air for the purpose of selling them land, goods, or property, including franchises or distributorships, when the carriage is within the scope

- 31 -

of, and incidental to, that business and no charge, assessment, or fee is made for that carriage."